164 N.J. Super. 226 (1978)
395 A.2d 1270
VICTOR D'ARC, PLAINTIFF,
v.
MARY LEA J. D'ARC, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided November 20, 1978.
*230 Mr. Monroe Ackerman for plaintiff.
Messrs. Wharton, Stewart & Davis for defendant (Mr. Richard H. Thiele, Jr., appearing).
IMBRIANI, J.C.C.
It would be worthwhile to first state the long, torturous path along which this bitterly contested divorce case has been litigated.
Dr. Victor D'Arc, a psychiatrist (hereinafter often referred to as the husband) filed suit for divorce on September 24, 1976 on the grounds of extreme cruelty. Due to difficulty in serving defendant wife it was not until March 30, 1977 that Mary Lea J. D'Arc, scion and heiress of the pharmaceutical fortune of Johnson & Johnson (hereinafter referred to as the wife) filed an answer and counterclaim for divorce on the grounds of deviant sexual conduct and extreme cruelty. On April 20, 1977 the husband amended his complaint to include a count of adultery.
There was extensive pretrial discovery. There was also an interlocutory appeal to the Appellate Division which, amongst other things, ordered the trial bifurcated as to the divorce and financial aspects.
The trial as to the divorce commenced on December 12, 1977. It was apparent at the outset that the trial would be extended and "messy." It was also immediately apparent that neither party had the slightest desire to continue the *231 marriage. Accordingly, both parties, with the consent of the other, amended their pleadings to include a count for divorce alleging 18 months' no-fault separation.
They submitted their proofs and the court granted a dual divorce to both parties on the ground of 18-month separation. At the time of the entry of the dual divorce both parties stipulated that when the financial aspects were tried at a later date, each party reserved the right to offer proof of marital fault conduct by the other and that such evidence would be relevant and admissible on the issues of alimony and equitable distribution of marital assets.
The court also permitted the wife to resume her maiden name of Mary Lea Johnson. Accordingly, when referring to the wife hereinafter, the court will often use her maiden name.
The remaining or financial portion of the trial commenced February 21, 1978. As the result of illnesses of the husband and the court being assigned to try other cases out of county, the testimony as to alimony and equitable distribution was not concluded until July 27, 1978, after 12 days of actual testimony.
Summations were by written briefs submitted in the latter part of September.
Now for the evidence.
Both were previously married to another spouse and divorced. He had two children, she six. They met while the husband was professionally treating one of the wife's sons. They dated, lived together approximately one year and then married on June 15, 1972. They separated on February 22, 1976, some three years and eight months later. On the day they separated the parties signed an agreement which was prepared by the husband. That agreement is discussed in detail infra.
The husband had a private psychiatric practice in New York City prior to the marriage and earned $50,000 a year. After the marriage he continued his practice for a brief period, but because, as he asserted, he had to assume management *232 of his wife's financial affairs, he discontinued his private practice. The wife disputed this claim and, on the contrary, said she urged him to continue his private practice so that he would not be totally dependent on her.
The wife is the beneficiary of a substantial trust fund created by her father with stock in Johnson & Johnson, the international pharmaceutical firm. Independent trustees have absolute discretion in the distribution of both income and principal; her annual income is, and has been for a considerable time, in excess of $1,000,000 annually. During this marriage, except for the small earnings of the husband shortly after the marriage, all of the funds spent by those parties were provided by the wife.
Her monetary contributions to the marriage were considerable. For instance, apart from providing funds to live and maintain themselves and their children in high style, she contributed $1,600,000 to purchase a Far Hills, New Jersey, residence; $450,000 to purchase property adjoining the residence; $250,000 to acquire investment property in Bridgewater, New Jersey; $525,000 to acquire real estate in Clinton, New Jersey; $750,000 to acquire personalty and art objects; $200,000 to purchase an apartment in New York City; and much more.
The husband had his own personal bank account during the marriage. He was also authorized to draw checks on his wife's bank account. During the marriage, whenever he needed funds for himself, he merely drew a check upon his wife's account and deposited the funds to his own account. We do not know how much money he so acquired from his wife's checking account, but we do know that she never denied or refused his requests for money.
On the date of separation Dr. D'Arc typed a one-sheet agreement, which both promptly signed. The essential terms thereof were that Miss Johnson agreed to pay her husband "tax free alimony of $10,000 per month indefinitely"; further, if he should predecease her, Miss Johnson was to pay all of the "educational expenses" of his two children by *233 his first marriage and "the sum of $25,000 each per year indefinitely."
Any chance at reconciliation was demolished in March and April 1976 when the wife received information that her husband was negotiating to arrange for her murder. The husband denied the charges and countered with the charge that, in fact, his wife had solicited someone to murder him.
The husband produced a witness who supported his charge. The wife produced a tape recording of telephone conversations wherein one of the speakers clearly offered the other $50,000 to murder Miss Johnson. The husband denied that he was the speaker in the recorded telephone conversation. The tape recording was admitted following an Evid. R. 8(1) hearing. See State v. Cardone, 146 N.J. Super. 23 (App. Div. 1976).
Since these accusations may be relevant on the issues of alimony and equitable distribution, they should be resolved first.
The husband produced Thomas Tracy, a bartender from New York City, who testified that one evening Miss Johnson went to the tavern where he was employed as a bartender and offered to "take care of him" by setting him up in his own tavern if he would "get rid" of her husband "permanently." He said he refused her offer. John A. Clohessey testified that he saw Tracy and Miss Johnson speak to each other at the tavern, but he did not overhear their conversation. Miss Johnson admitted being at the bar and speaking with Tracy, but vehemently denied any discussion about murdering her husband.
The wife put into evidence a tape recording bearing seven different telephone conversations, allegedly between her husband and a Teddy Fino, which conversations took place in New York City. In those conversations the party alleged to be the husband offered Fino the sum of $50,000 to murder Miss Johnson. She claims that Fino purported to go along with the proposal but, in fact, took the recordings to *234 Miss Johnson, presumably with the intent to sell her the original tape and his testimony.
She took a copy of the tape recording to the district attorney's office in New York City. That investigation is stalled because of the refusal of Fino to testify before the New York grand jury.
The recording was given to a voiceprint expert to compare to a voice exemplar of the husband obtained by court order. The order was the main reason for the appeal to the Appellate Division. The voiceprint expert was offered by the wife as a witness, but the court sustained the objection to such testimony on the ground that the voiceprint technique is not presently recognized within the scientific community as being sufficiently accurate and reliable. See the court's reported decision, D'Arc v. D'Arc, 157 N.J. Super. 553 (Ch. Div. 1978).
The wife then produced the testimony of herself, her attorney, her son, a friend, and their household maid who each testified that they were familiar with the voice of Dr. D'Arc, the husband, that they listened to the taped telephone recordings and that the voice of the party in such telephone recordings who offered to pay $50,000 for the murder of Miss Johnson was that of Dr. D'Arc.
The court suggested that the parties submit to a polygraph examination. They agreed. The court selected an independent polygraph examiner who examined both parties. He testified that in his opinion Miss Johnson was truthful when she said that she never asked Tracy, the bartender, nor anyone else to murder her husband. However, the examiner was unable to provide an opinion with respect to the husband in spite of the fact that he was examined on two different occasions. The examiner said he "felt he [Dr. D'Arc] was not cooperating with me." The husband was hyper-ventilating (i.e., controlling his breathing) to such an extent that the examiner was unable to render an opinion.
The husband thereafter retained Natali Laurendi, a self-employed polygraph examiner, who testified that he examined *235 the husband and concluded that he was truthful when he stated that he was not the person on the taped telephone recordings and that he never asked anyone to murder his wife. This court found several weaknesses in his testimony (see particularly the court's examination of the witness) and concludes that Natali Laurendi was not a credible witness. While the court is concerned that the husband apparently intentionally prevented the independent polygraph examiner from obtaining a reading, the court will disregard and give no weight in its determination to any of the polygraph examinations of Dr. D'Arc.
Based upon the testimony the court is satisfied that the husband has not proven by a preponderance of the evidence that his wife asked either Thomas Tracy or anyone else to murder her husband. Indeed, the evidence clearly and convincingly belies such accusation.
Did the wife prove by a preponderance of the evidence that her husband sought to solicit her murder? We must recognize that while the charge is that of a serious criminal accusation, we are dealing with a civil case where the burden of proof is by a preponderance of the evidence, not proof beyond a reasonable doubt.
The court was very impressed with the credibility of the witnesses who identified the husband as the speaker in the telephone conversations. Particularly credible was Olive Cohen, the housemaid, who testified that one day she heard the voice of Dr. D'Arc in another room, but when she entered, she learned to her surprise that a tape was being played and Dr. D'Arc was not present. Conversely, the court was not impressed with the credibility of the husband when he denied his complicity.
Further, there were at least four comments made in the seven telephone conversations that corroborate the wife's charges because statements made therein could only be known by Dr. D'Arc or somone extremely intimate with him.
First, we now know that in March and April 1976, when the recordings were being made, that Dr. D'Arc was negotiating *236 a possible settlement with the attorney for his wife. The voice identified as that of Dr. D'Arc on the tape was aware of the negotiations and noted that while there was some pressure to get an agreement signed, he was certain he could "stretch out the negotiations for two or three months."
Second, in one of the conversations Fino referred to a "picture" and the other speaker responded with a remark which clearly had reference to his involvement in a motion picture venture. Obviously, the speaker misunderstood, since Fino was referring to a "photograph," which is the normal connotation that anyone without knowledge of the motion picture involvement of these parties would attach to the word "picture." We know that these parties were involved as investors in several motion pictures. In that same conversation, when he realized that Fino was referring to a "photograph," the speaker noted that he knows where his wife is throughout the day and that there are pictures (i.e., photographs) of her at the art gallery, another venture in which these parties were involved.
Third, and especially damaging, the voice on the tape identified as that of Dr. D'Arc stated as early as April 1976 that he preferred that the murder take place while he was out of town and that he intended to be in Texas on May 4, 5 and 6. Dr. D'Arc testified in court that he called the attorney for his wife on May 4 from Kennedy Airport, as he was about to fly to San Antonio, Texas for a three-day conference. Who but Dr. D'Arc would have known in early or mid-April that he planned to be in Texas for those three days?
Fourth, the person identified as Dr. D'Arc on the tape said it was not "acceptable" that Miss Johnson be "shot down in the street," and insisted that "I'd like it to be, you know  a mugging." One must ask, who would be concerned with how Miss Johnson was murdered? Patently, whoever would fear that he would be looked upon as a likely suspect. And who would best fit that description, but an estranged *237 spouse who would stand to gain a share in the estate of his extremely wealthy wife?
Accordingly, considering the credibility of the wife and her witnesses who positively identified Dr. D'Arc as a speaker in the telephone conversations, the lack of credibility of Dr. D'Arc himself, and the corroboration of some of the statements on the tapes, this court is satisfied that Miss Johnson has proven by a preponderance of the evidence that her husband, Dr. D'Arc, was the person on the taped telephone recordings who offered Fino $50,000 to murder her.
This being so, is the husband entitled to alimony? On principles of equity, he certainly is not. Nevertheless, the husband urges that this court cannot deny alimony because the court granted both parties a divorce on no-fault grounds and N.J.S.A. 2A:34-23 expressly provides that fault may not be considered in awarding alimony where the judgment of divorce "is granted solely on the ground of separation," as occurred here.
The court could, of course, amend the judgment of divorce to add a clause that the wife is also granted a divorce on the grounds of extreme cruelty. However, in this case the parties clearly stipulated, at the time when we aborted the initial trial to grant a divorce on grounds of no-fault, that both parties, during the trial on alimony and equitable distribution, could offer proof of fault and that it would be considered by the court on the questions of alimony and equitable distribution. Based on that stipulation alone, this court believes that fault may be, and should be, considered on the issue of alimony.
Even if "fault" could not be considered, it is clear that on the merits Dr. D'Arc is not entitled to alimony. Alimony is based upon "need" and in determining that issue we should inquire into the income of the spouse seeking alimony. Capodanno v. Capodanno, 58 N.J. 113 (1971); DiTolvo v. DiTolvo, 131 N.J. Super. 72 (App. Div. 1974). Not only is Dr. D'Arc not in "need" of support, but the *238 record clearly shows that he is able to provide a comfortable living for himself.
He is a physician specializing in psychiatry now earning $40,000 a year, with a potential to earn far greater sums in the future. While it is true that he will not be able to maintain the same lavish level of living he enjoyed while married to Miss Johnson, it cannot be said on this record that Dr. D'Arc in the space of approximately 3 1/2 years of marriage has become so accustomed to the style of living he enjoyed while married to her that he is now entitled to be maintained by her in that same style.
The court is satisfied that Dr. D'Arc is not entitled to receive alimony from Miss Johnson.
But is he entitled to enforcement of the February 22, 1976 agreement in which Miss Johnson agreed to pay Dr. D'Arc $10,000 a month tax free? As noted in Carlsen v. Carlsen, 72 N.J. 363 (1977):
As a contract between husband and wife, the agreement is unenforceable at law. (Cases cited). Such a contract may, however, be enforced in equity if found to be fair and equitable. [at 370]
The traditional rule in New Jersey is that contracts between husband and wife are generally unenforceable at law because usually a husband has a dominant influence over his wife. Cohen v. Cohen, 121 N.J. Eq. 299 (Ch. 1936). Before such a contract will be enforced in equity, the court will carefully scrutinize it to make certain that the wife has not been defrauded or coerced by undue influence or improper conduct by her husband. Wolff v. Wolff, 134 N.J. Eq. 8 (Ch. 1943).
Generally, when a wife has not been represented by an attorney any agreement between spouses will be set aside, unless the husband can affirmatively demonstrate that he has dealt "fairly and justly with his wife." Ferrante v. Philpott, 1 N.J. Super. 393, 396 (Ch. 1948).
In this case the evidence is clear that the wife was not represented by an attorney at the time she signed this *239 agreement, in spite of the fact that for many years she had retained counsel in New York City with whom both she and Dr. D'Arc conferred frequently on business and tax matters. The wife testified candidly that she signed the agreement voluntarily after reading it. She testified that she understood the $10,000 tax-free monthly payment was not intended as alimony, but was merely an allowance, because she did not intend to seek a divorce at that time. Yet, the agreement provided that it should be incorporated into a divorce decree, if one was obtained.
This court concludes that the agreement of February 22, 1976 is not clear on its face as to what the parties intended, especially as to whether it constituted what the parties thought to be fair and equitable as alimony should the parties ever divorce, which was a course of action neither apparently sought at that time. Further, the court is especially concerned that the husband permitted his wife to sign this agreement when he well knew that she had retained counsel in New York City with whom she has dealt for many years and that she invariably sought his legal advice whenever a legal or business problem arose. Yet, he never suggested to the wife, who has had limited business experience, that she seek the independent advice of her attorney. Evidence of the unfairness and unjustness of the agreement was given by the attorney for Miss Johnson who testified that, because of Miss Johnson's income tax bracket, this agreement would cost her about $400,000 a year, a not insignificant portion of her income.
Under these circumstances, the court finds that it would be unfair, unjust and inequitable to enforce the February 22, 1976 agreement.
Before I inquire into what assets are subject to equitable distribution, I shall first address myself to the question of whether "marital fault" should be taken into consideration by the court on such issue.
*240 A few preliminary observations. First, there is no statutory bar to considering "fault" in dividing the marital assets. Our statute is silent.
Second, it is the general rule that a person who murders a spouse is barred from claiming a share of the estate of the deceased spouse. Small v. Rockfeld, 66 N.J. 231 (1974). Should such a bar vanish if the attempt to murder one's spouse was unsuccessful? Of course, Dr. D'Arc argues that he is not seeking a share of "his wife's estate," but rather a fair and equitable share of "our estate." Is his argument a matter of semantics?
Third, Dr. D'Arc asks this court to give him an equitable share of the marital assets, and simultaneously denies the applicability of the equitable doctrine of unclean hands, which is based on the premise that one should not profit from his wrongdoing. The husband points to N.J.S.A. 2A:34-7 which abolished the doctrine of unclean hands as a defense in matrimonial actions. Does that statute apply to equitable distribution of marital assets? This court thinks not.
Rothman v. Rothman, 65 N.J. 219, 228-9 (1974), stated that the philosophy bottoming our policy of equitable distribution of assets is two-fold. First, to provide the less financially secure spouse (usually the wife) with protection in the event the spouse paying alimony should die or experience financial misfortune, thereby leaving the spouse receiving alimony destitute. Second, to provide both spouses with a share of the family assets accumulated during the marriage, so as to divide marital assets on the concept that "marriage is a shared enterprise, a joint undertaking, that in many ways * * * is akin to a partnership". (At 229).
Pursuant to that philosophy, Chalmers v. Chalmers, 65 N.J. 186 (1974), said:
Should matrimonial fault be one of the criteria or circumstances that may properly be taken into account [in the equitable distribution of assets]? We conclude that the answer must be in the negative even though the statute speaks of "equitable distribution". Indeed, *241 we are satisfied that the concept of "equitable distribution" requires that fault be excluded as a consideration. [At p. 193]
The court then gave two basic reasons for this holding. First, "fault may be merely a manifestation of a sick marriage," id. at 193, and only reflects how a person reacted to a marital problem which may not be of his or her making. Second, the court repeated the partnership or shared enterprise theory that each contributed to the marital estate and we are merely giving to each what really belongs to him or her.
A surface analysis of these cases would support the argument that fault should not be a consideration. But here we have facts which distinguish this case from Chalmers.
Here Dr. D'Arc contributed little, if anything, to this marriage and, indeed, reaped handsome financial benefits during the marriage. There was never any "partnership" or "shared enterprise." He merely shared in the enormous sums of money that his wife received from her father's trust fund. There was never any "giving" by the husband in the usual sense that we use that word with respect to a marriage  he simply received throughout the short period of the marriage.
Further, here we are not dealing with the usual type of "fault" where the conduct of one spouse may merely be a reaction to the faults or shortcomings of the other spouse. Here the "fault" is an attempt by Dr. D'Arc to commit one of the most heinous crimes known to mankind  murder.
Dr. D'Arc recites platitudes that "equity does not repel all sinners," citing Garlinger v. Garlinger, 137 N.J. Super. 56, 62 (App. Div. 1975), and that "the Court is not the keeper of public morals." But where a spouse has committed an act that is so evil and outrageous that it must shock the conscience of everyone, it is inconceivable that this court should not consider his conduct when distributing the marital assets equitably. I note that one court did invoke "fault" to deny a wife an interest in the family residence, despite *242 the fact that the marriage existed for sixteen years. Sanders v. Sanders, 118 N.J. Super. 327 (Ch. Div. 1972).
The obligation of this court is to implement the purpose of law, which is to do justice, and not to mechanically apply established principles of law, even when they compel an absurd result. To ignore the facts of this case would be tantamount to permitting Dr. D'Arc to obtain by indirection that which he failed to obtain by a direct attack upon the life of his spouse. He may not obtain through the back door that which he is barred from taking through the front door.
I would also note that, apart from the legal merits of this issue, both parties stipulated that fault would be relevant on the issue of equitable distribution.
I note that the state of title is of no significance when dividing marital assets. A spouse, for instance, does not acquire a vested right to property merely because an asset is put in sole name of that spouse or in their joint names. Perkins v. Perkins, 159 N.J. Super. 243 (App. Div. 1978). All assets acquired during the marriage in which either spouse has an interest, regardless of how acquired or what the state of title may be, are subject to equitable distribution.
What should the husband be awarded from the assets of this marital partnership? All of the money was contributed by Miss Johnson. The assertion of Dr. D'Arc that he managed the financial affairs of his wife is unsupported by the facts. At best the proofs showed that these parties used funds acquired from the wife's trust fund to participate in several property acquisitions, investments in art objects and investments in motion picture and theatre ventures which were more in the nature of entertainment, than true commercial ventures to earn income. Indeed, it is apparent that these parties were incredibly inept in such ventures.
There was no credible evidence offered by either party of the value of the marital assets. Both generally relied upon cost values.
The husband urges that he be awarded the entire interest in the United Nations apartment and stock of Bernards State *243 Bank (or proceeds from their sale), and that all of the remaining assets be divided equally. The court notes that while the record discloses most of the assets, it is not disputed that Dr. D'Arc removed many art objects to an undisclosed location, which, in the opinion of counsel to Miss Johnson, had a value of approximately $200,000. Nor did he account for the proceeds of various bank accounts that he withdrew or life insurance policies that he cashed and admittedly used for his personal living expenses.
On the other hand, the wife urges that all assets, be they real estate, art objects, stock, interests in film projects and theatre plays, or bank accounts be conveyed into her sole name. Many of these items are in their joint names.
Considering all of the circumstances, the court finds that equity dictates that the vast bulk of these assets should be returned to Miss Johnson. Dr. D'Arc shall be permitted to retain a certain few assets. Candidly, the court believes that Dr. D'Arc is entitled to nothing, but to compel an accounting of assets which he has secreted or already expended may well be a venture in futility and consume inordinate time of counsel and the court.
Accordingly, the court directs that all of the following assets, or any interest that the parties have or may hereafter acquire therein, shall be conveyed forthwith to Miss Johnson:
1. All real property in Far Hills, New Jersey, whether held in the individual names of the parties or in corporate name, such as Far Hills Nursery, Inc.
2. All of the stock in Merriewold West, Inc. and any other corporation formed for the purpose of dealing in art objects.
3. All art objects, including those removed by the husband from the inventory of Merriewold West, Inc., not sold prior to December 20, 1977.
4. The cash funds now held in escrow by Wharton, Stewart & Davis, attorneys, following the sale of real property in California.
5. All real property in Bridgewater, New Jersey.

*244 6. All stock in the Bernards State Bank.
7. All interest of the parties in and to certain properties in Clinton, New Jersey, including the $50,000 certificate of deposit being held by the husband in a New York City bank.
8. All right, title and interest in and to all film projects and theatre plays.
The husband shall be permitted to retain the net proceeds from the sale of the United Nations apartment which he claimed amounted to $120,000, the cash proceeds of $16,000 received from the sale of 1,000 shares of stock in Bernards State Bank, the relatively small bank accounts and life insurance policies which he cashed and appropriated to his sole use in the estimated amount of $25,000, and the proceeds that he realized from the sale of art objects sold prior to December 20, 1977, the date of the judgment of divorce. The amount of these latter proceeds is not and perhaps never will be known since Dr. D'Arc was less than candid concerning what art objects he removed, what he sold, or where the remainder of such art objects are stored. Miss Johnson shall be permitted to take the deposition of Dr. D'Arc to secure as much information as she can about what art objects remained in possession of Dr. D'Arc on December 20, 1977.
It is understood that to whatever extent Dr. D'Arc has any interest in the assets that are to be conveyed to his wife pursuant hereto, he shall cooperate in every way to effect such conveyances, including, but not limited to, execution of any and all deeds, stock transfers, and other documents. He shall also submit his resignation from any and all positions and offices which he occupies therein. Of course, it is understood that to the extent Dr. D'Arc shall be liable on any mortgage, lien or indebtedness incurred to acquire any of the assets to be conveyed to Miss Johnson, she shall be solely responsible to pay such mortgage, liens and indebtednesses, and shall hold Dr. D'Arc free from any liability thereon.
*245 Finally, the attorney for Dr. D'Arc has submitted a bill for legal services in the amount of $63,163.07 which he asks Miss Johnson to pay. Dr. D'Arc testified that he has already paid $30,000, leaving a balance due of $33,163.07. In determining whether an award of counsel fees should be made the court should look at the respective liquid assets of the parties, Lavene v. Lavene, 148 N.J. Super. 267 (App. Div. 1977), the complexity of the issues, including the time spent by counsel in trial preparation and in court, Mayer v. Mayer, 150 N.J. Super. 556 (Ch. Div. 1977), and whether the husband institutes the action in good faith. Williams v. Williams, 59 N.J. 229 (1971).
Certainly this was a difficult and complex case and the wife has ample means to pay the counsel fee of her husband. The court is mindful of its findings on the charge of murder, but it must be appreciated that the husband may well have believed that in spite of such a finding he was nonetheless entitled to alimony and a substantial share of the marital assets. The law in New Jersey on this point is by no means clear.
Under the circumstances, this court directs Miss Johnson to pay $15,000 of the counsel fee of Dr. D'Arc's attorney. In addition, she shall pay the fee submitted by Earl Kane, the court-appointed polygraph operator.