935 A.2d 796 (2007)
396 N.J. Super. 532
Christopher P. CALBI, Plaintiff-Appellant,
v.
Linda J. CALBI, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted January 18, 2007.
Decided November 21, 2007.
*797 Christopher P. Calbi, appellant pro se.
Linda J. Calbi, respondent pro se.
Before Judges STERN, COLLESTER and SABATINO.
The opinion of the court was delivered by
COLLESTER, J.A.D.
This sad case raises the issue as to whether a change of circumstances resulting from the wrongful death of a child caused by an alimony recipient terminates or reduces the alimony obligation.
As gleaned from the record submitted to us, the facts are as follows. Plaintiff Christopher Calbi and defendant Linda Calbi were married on July 26, 1986. They had two children, both boys: Matthew, born on December 29, 1988, and D.[1], born on July 29, 1994. After fifteen years of marriage, Christopher filed a complaint for divorce. The marriage was dissolved with a judgment on July 25, 2001. That judgment apparently incorporated a property settlement agreement (PSA) which awarded physical custody of the two children to Linda and permanent alimony of $3,183 per month. Since the record on appeal includes neither the agreement nor the divorce judgment, we are unaware of any agreed amount of child support and are unable to consider whether some portion of child support is denominated as alimony for purposes of a tax advantage to Christopher.
Christopher certified that Linda was an active and violent alcoholic who abused and assaulted him, at times with a kitchen knife and a hammer. Although he claims police responded to his home on two occasions, the record before us does not reference a domestic violence complaint or restraining order. Christopher also said that after he moved out in September 1999, Linda focused her violent behavior on Matthew. He states that after teachers or officials in Matthew's school saw bruises on Matthew's arms and legs, the Division of Youth and Family Services (DYFS) conducted an investigation, but the record does not include the result of any investigation. Christopher certified that Linda was involved in an automobile accident in 2002 while driving the children to school, and a police officer at the scene told him that he believed Linda was under the influence of alcohol. But the record is barren as to whether Linda received a summons for driving under the influence. Nonetheless, it is undisputed that Linda had a severe alcohol addiction, and in September 2002 she was arrested and later convicted of drunk driving.
Things came to a head on April 30, 2003, when Linda overdosed on a mixture of alcohol and prescription drugs. DYFS placed the children with Christopher while Linda attended a residential rehabilitation center. When she left the facility, the children remained with Christopher, but *798 they visited with Linda after school and overnight on weekends. Despite this change in residential custody, it appears that there was no reduction in support paid by Christopher.
The relationship between Linda and her son Matthew was very strained, and they both attended therapy sessions to deal with the problem. During an overnight visitation on Saturday, August 16, 2003, the short life of young Matthew came to a violent and tragic end. That night Matthew remained in his room at Linda's house watching television until he went to bed at about 11 p.m. D. was already asleep. Linda admittedly consumed a bottle of brandy before falling asleep, and she awoke at about 5 a.m. She walked her dog and then turned on the television. Matthew came downstairs about 5:30 a.m. to ask her to turn the volume down and then went back to bed. Sometime later that morning an argument between Linda and Matthew turned violent. Linda had little recollection of the incident other than the fact that Matthew bit her, but she believed Matthew's statements that she struck him first with her hands and then kicked him.
After the fight, Matthew called his father to say he was hurting. He locked himself in his room and called 9-1-1 for help. He was taken by ambulance to the Pascack Valley Hospital emergency room where he continued to complain of pain in the area of his neck and right shoulder. Hospital personnel observed that the right side of Matthew's neck was grossly swollen, and the intensity of his pain continued to increase. When his aunt arrived at the hospital, Matthew told her his mother kicked him three times, twice in the head and once in the right shoulder. A CT of his neck showed active internal bleeding from the right subclavian artery with extensive hemorrhaging. Concerned about diagnosis and treatment in this unusual case, emergency room doctors arranged to transfer Matthew by Univac to Westchester Medical Center for more specialized treatment and surgery. But the transfer was aborted when Matthew's pain dramatically increased. He began sweating profusely, and his respiration became labored. An emergency median sternotomy was performed by breaking the sternum to gain access to the heart and lung area. About 200 cc of blood was removed from the area around his pericardium, and another 2.5 liters of blood from his right pleural cavity. The surgery revealed bleeding in the internal jugular and subclavian veins and a tear in the mid subclavian artery. Although Matthew received blood and blood products during the surgery, he bled to death. When he did not respond to resuscitation, he was pronounced dead at 12:50 a.m. on Monday, August 18, 2003.
An autopsy performed by the Bergen County Deputy Medical Examiner noted severe injuries to Matthew's neck as well as evidence of head trauma and contusions on his torso and extremities. The cause of death was blunt force trauma to the neck, and his death was listed as a homicide. At the request of the Bergen County Prosecutor's Office, Dr. Kenneth G. Swan, a professor of surgery at UMDNJ/New Jersey Medical School, reviewed the information concerning Matthew's death and concluded that he had sustained a "variant of scapulothoracic dissociation" resulting from severe blunt trauma and traction to the shoulder girdle. Dr. Swan explained that scapulothoracic dissociation is an uncommon injury with fewer than sixty cases reported since its first description in 1984 by orthopedic surgeons. Even with proper medical attention, the result is often amputation. He said the overall mortality rate for this injury is about twenty percent. Survival depends upon timely recognition of the condition and appropriate *799 surgical intervention. He concluded as follows:
I believe the force generated by Matthew Calbi's mother, Linda Calbi, in extending her thigh upon her hip and her leg at the knee, striking Matthew with the plantar surface of her foot on the right side of his neck, while at the same time immobilizing, in her grasp, his right upper extremity, to be sufficient to cause the injury which resulted in his death.
After Matthew's death, Christopher fell behind in his alimony payments. In October 2003, two months after his son's death, he filed a motion to reduce or terminate alimony. The motion was denied by the Family Part judge without prejudice to reconsideration after criminal proceedings against Linda were concluded. On January 24, 2006, about two and a half years after Matthew's death, Linda filed a motion to enforce litigant's rights for payment of accumulated alimony arrears. Christopher again filed a cross-motion to reduce or terminate alimony. The Family Part judge granted Linda's application for payment of arrearages and directed that alimony be continued in the same amount set in the divorce judgment. He declined to rule on Christopher's motion to terminate or reduce alimony pending financial discovery and a plenary hearing.
On March 1, 2006, the Bergen County assistant prosecutor in charge of the case against Linda wrote a letter to the Family Part judge at Christopher's request to advise that Linda was to plead guilty on April 17, 2006 to second-degree aggravated assault under N.J.S.A. 2C:12-1(b)(1) for causing serious bodily injury to Matthew. Under the plea agreement, the prosecutor was to recommend a sentence of three years in New Jersey State Prison with eighty-five percent parole ineligibility under the No Early Release Act, meaning Linda was to serve a minimum of about thirty months. After reviewing the letter, the Family Part judge moved up the plenary hearing date to May 10, 2006. Christopher filed an amended motion on short notice to permanently terminate alimony and to vacate the arrearages that had accrued from the date of Matthew's death.
On May 10, 2006, the judge decided that any application as to support should await Linda's release from prison. No testimony was taken at that time. The judge suspended alimony while Linda was incarcerated and directed that no arrears accrue during this time. He also held that after Linda's release, she could apply to reinstate alimony, and the court would determine what spousal support, if any, was necessary. Christopher's request to vacate arrears was denied and he was ordered to reduce the accumulated arrearage by paying $400 per month to Linda's prison account during her incarceration. Christopher has appealed that portion of the court's May 10, 2006 order denying his application to terminate alimony and vacate the arrearage as well as the provision that he must make payments to reduce the arrearage while Linda remains in jail.
We first address the denial of Christopher's motion to permanently terminate his alimony obligation to Linda based on her conduct in causing the death of Matthew. The applicable statute states that a court may make an order for alimony or maintenance "as the circumstances of the parties and the nature of the case shall render fit, reasonable and just . . ." and that such orders "may be revised and altered by the court from time to time as circumstances may require." N.J.S.A. 2A:34-23. Nearly three decades ago in Lepis v. Lepis, 83 N.J. 139, 416 A.2d 45 (1980), the Supreme Court reviewed the standards and procedures when considering post-judgment modification of support *800 orders based on a showing of changed economic circumstances. The Court focused on maintaining the marital standard of living in the context of a dependent spouse's needs and the financial ability of the supporting spouse to maintain the amount previously ordered. Id. at 152-53, 416 A.2d 45. The court stated that the request of a supporting spouse to decrease support would be granted "when circumstances render all or a portion of support received unnecessary for maintaining that standard." Id. at 153, 416 A.2d 45. In this case, Christopher argues that his alimony obligation should be terminated without assessment of Linda's needs or his ability to pay because Linda's wrongful actions make any alimony award contrary to the statutory requirement in N.J.S.A. 2A:34-23 that it be "fit, reasonable and just."
To resolve the issue we must consider the concept of fault and how it relates to an award of alimony or its modification. Marital fault is excluded as a consideration in an award of equitable distribution of marital property. Chalmers v. Chalmers, 65 N.J. 186, 193, 320 A.2d 478 (1974). It is also not a consideration in determining the amount of child support. Ionno v. Ionno, 148 N.J.Super. 259, 260-62, 372 A.2d 624 (App.Div.1977). And, unless fault is independently determined to be proof of parental unfitness, it is not determinative of custody. Fantony v. Fantony, 21 N.J. 525, 538, 122 A.2d 593 (1956). However, fault has historically played a role in the award or denial of alimony. See generally, Skoloff & Cutler, New Jersey Family Law Practice, § 5.3A(6), at 5:75 (12th Ed.2006).
N.J.S.A. 2A:34-23(b), enacted as part of the 1971 Divorce Reform Act, lists thirteen relevant factors in awarding or denying alimony, twelve of which related to economic considerations including the needs of a dependent spouse and the supporting spouse's ability to pay support. Fault was not listed as a factor. Nonetheless, courts have considered fault under the statute's catch-all factor thirteen which includes "any other factors which the court may deem relevant." See Greenberg v. Greenberg, 126 N.J.Super. 96, 99-102, 312 A.2d 878 (App.Div.1973) (reversing an increase in alimony based on extreme cruelty); Mahne v. Mahne, 147 N.J.Super. 326, 371 A.2d 314 (App.Div.1977) (denying alimony because of the "lurid" and flagrant adultery of the wife); see also Nochenson v. Nochenson, 148 N.J.Super. 448, 449-50, 372 A.2d 1139 (App.Div.1977).
Consideration of fault in alimony determinations was significantly limited in Lynn v. Lynn, 165 N.J.Super. 328, 333, 398 A.2d 141 (App.Div.1979), in which we held that the post-separation adultery by the wife did not constitute such "egregious fault" to enter into the calculus of alimony. Similarly, in Gugliotta v. Gugliotta, 164 N.J.Super. 139, 395 A.2d 901 (App.Div. 1978), we affirmed an alimony awarded to a wife guilty of adultery because we found that marital fault was only one factor for consideration and that it was outweighed by economic factors such as the earning capacity of the parties and the length of the marriage. See also Ruprecht v. Ruprecht, 252 N.J.Super. 230, 240, 599 A.2d 604 (Ch.Div.1991) (permitting discovery limited to the economic aspects of wife's adulterous acts). In Kinsella v. Kinsella, 150 N.J. 276, 314-15, 696 A.2d 556 (1997), which dealt with disclosure of psychological records, the Supreme Court said by way of dictum that "the focus of the decision regarding alimony is generally on the financial circumstances of the parties." Id. at 314, 696 A.2d 556.
The question of fault and its effect on alimony was clarified in Mani v. Mani, 183 N.J. 70, 869 A.2d 904 (2005). The opinion *801 by Justice Long held that marital fault was irrelevant to alimony except in two narrow instances: cases in which fault has affected the economic life of the parties, and "cases in which the fault so violates societal norms that continuing the economic bonds between the parties would confound notions of simple justice." Id. at 72, 869 A.2d 904. The fault capable of affecting an alimony award was also described as "egregious fault," defined as follows:
[E]gregious fault is a term of art that requires not simply more, or even more public acts of marital indiscretion, but acts by their very nature, are different in kind. By way of example but not limitation, California has legislatively barred alimony payments to a dependent spouse who has attempted to murder the supporting spouse. Cal. Fam. Code § 4324. Deliberately infecting a spouse with a loathsome disease also comes to mind. Underlying these examples is the concept that some conduct, by its very nature is so outrageous that it can be said to violate the social contract, such that society would not abide continuing the economic bonds between the parties. In the extremely narrow class of cases in which such conduct occurs, it may be considered by the court, not in calculating an alimony award, but in the initial determination of whether alimony should be allowed at all.
[Id. at 92, 869 A.2d 904.]
An example of the "egregious circumstances" as defined in Mani was in D'Arc v. D'Arc, 164 N.J.Super. 226, 395 A.2d 1270 (Ch.Div.1978), aff'd in part, rev'd in part, 175 N.J.Super. 598, 421 A.2d 602 (App.Div.1980), certif. denied, 85 N.J. 487, 427 A.2d 579 (1980), cert. denied, 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 350 (1981). In that case the husband sought alimony from the wife after a dual judgment of divorce on no fault grounds. The wife stated she received information that her husband was negotiating for her murder. The husband denied the charge and countered that his wife had solicited someone to murder him. The trial judge made factual and credibility findings in favor of the wife. The court then disallowed alimony to the husband based on his insufficient showing of need but added that principles of equity would also preclude any alimony award based on his marital fault. Similarly, in Brabec v. Brabec, 181 Wis.2d 270, 510 N.W.2d 762 (Wis.App.1993), a Wisconsin case resembling D'Arc, the wife attempted to hire someone to kill her husband. The Wisconsin court held that while marital misconduct is normally not considered in ordering support, it was fundamentally unfair to require a husband to pay maintenance to the person who tried to have him killed. Id. at 282, 395 A.2d 1270.
Domestic violence toward the supporting spouse was also held to constitute special circumstances permitting termination of alimony even though a provision of the PSA provided that spousal support was not subject to modification or termination. In re Marriage of Cauley, 138 Cal.App.4th 1100, 41 Cal.Rptr.3d 902 (2006). In Cauley the former wife was convicted of domestic violence and violating a restraining order. Relying upon a California statute that an award of spousal support should not be made to a spouse convicted of interspousal domestic violence, the court held that the public policy embodied in the statute outweighed any interest in the enforcement of the interspousal support provision because equity would not enforce an agreement that would support harassment. Id. at 905-06.
In Reid v. Reid, 310 N.J.Super. 12, 22, 708 A.2d 74 (App.Div.1998), we held that "egregious circumstances" could include financial defalcations by the spouse seeking alimony. In that case, the husband and *802 wife each had substantial assets. The wife established a separate residence, wasted significant assets and eventually filed for bankruptcy protection. The bankruptcy judge made a finding that the wife embezzled from the husband's company. The Family Part judge denied alimony on grounds that it would be inequitable to order alimony for a spouse who had misappropriated marital assets. We affirmed, stating that marital fault rarely is pertinent to an alimony award, but holding that the facts constitute one of the rare cases justifying denial of alimony. Id. at 22, 708 A.2d 74.
In the instant case, while Linda's wrongful acts were not directed at Christopher or intended to cause him harm, the emotional and psychological consequences to him were unquestionably grievous. The death of a child is the greatest tragedy that a parent can endure  in part because it is shockingly out of the ordinary sequencing of time and of generations. Anne McCraken & Mary Semel, A Broken Heart Still Bleeds After Your Child Dies, at p. 261 (Hazelden Press 1998). We acknowledge Christopher's words that Matthew's death has caused a huge hole in his heart that cannot be mended. We can also understand his resentment toward his ex-wife and any order directing him to pay her support.
However, in assessing Linda's fault and the terrible consequences from her contemptible action in beating her son, the facts negate both premeditation and the intent to kill. Indeed, the fact that murder or manslaughter charges were not pursued and the State recommended a third-degree sentence for a second-degree crime indicates that the prosecutor was satisfied that there was insufficient proof of an evil intent by Linda to kill her son so that the charge of assault and causing grievous bodily harm to Matthew was the proper assessment of Linda's criminal culpability. Moreover, while it is no excuse for her conduct, the fact remains that Linda was an active alcoholic and most probably under the influence at the time of the tragic incident. Also not to be ignored is the fact that the rare injury that caused Matthew's death was unforeseeable and unanticipated. Finally, although the record contains little information as to Linda's feelings after Matthew's death, we can safely assume she is haunted by memories and guilt that will long outlast her prison sentence, as will her knowledge that she is responsible for the greatest suffering in the world for a mother or father.
Nothing in this opinion prevents the Legislature from amending the alimony statute to specify that a former spouse's criminal act in taking the life of one of the parties' children per se disqualifies the ex-spouse from receiving alimony. But we do not read the present statute nor the analogous case law to create that automatic disqualification. Rather, whether non-economic fault constitutes "egregious circumstances" sufficient to deny or terminate alimony must be decided on a case-by-case basis. We hold that in the factual complex of this case Linda's conduct, dreadful as it was, does not fit the Mani standard for non-economic "egregious circumstances" sufficient to deprive her of needed support. The contrary result would simply add additional punishment to her criminal conviction and incarceration.
We cannot mend the hole in Christopher's heart anymore than we can expiate Linda's guilt. However, what we can and must do is consider whether the impact of Matthew's death on Christopher resulted in an economic change of circumstances such that his ability to pay alimony was prevented or hindered. He contends that his son's death, literally at the hands of his wife, devastated him not only emotionally *803 and psychologically but also financially. He claims his business failed because "when my son died, I sat in my office staring into space." He says his income precipitously declined while his debts and financial obligation to D. increased. He further certifies that because he has had no relief from his substantial alimony obligation, his arrears increased to over $40,000 despite his desperate attempt to comply with court orders by borrowing money and thus creating more debt. In court appearances he was told to put the tragedy behind him to seek "closure," and he was repeatedly threatened with incarceration for non-payment of alimony and arrears. Yet since October 2003 when he made his first application for termination or reduction of alimony, he has never received a ruling or a promised plenary hearing on his ability to pay due to his changed circumstances resulting from Matthew's death.
Christopher was then and is now entitled to a plenary hearing and a ruling on his motion for reduction of alimony and arrears as of the date of Matthew's death as requested in his initial application as well as subsequently to the present time. Pending that hearing, his alimony payments are suspended; his arrears after Matthew's death are vacated; and the Family Part court order directing arrears payments while Linda is in prison is reversed.
After her discharge from prison, Linda may make application for alimony, which will be determined based on her present needs and efforts to support herself as well as Christopher's ability to pay alimony.
Reversed.
NOTES
[1] The youngest child is referred to by initial because of his age and this court's policy to preserve the privacy of children.