869 A.2d 904

BRENDA MANI, PLAINTIFF–RESPONDENT, v. JAMES J. MANI, DEFENDANT–APPELLANT.

Argued September 13, 2004—Decided April 6, 2005.

*Dale E. Console* argued the cause for appellant.

*Patrick T. Collins* argued the cause for respondent (*Franzblau Dratch*, attorneys).

*Bonnie C. Frost* argued the cause for *amicus curiae*, New Jersey State Bar Association (*Edwin J. McCreedy*, President, attorney; *Ms. Frost* and *Stephen P. Haller*, on the brief).

Justice LONG delivered the opinion of the Court.

The appeal in this family law case presents the issue of whether marital fault is a factor in the determination of alimony and the award of counsel fees. We hold that marital fault is irrelevant to alimony except in two narrow instances: cases in which the fault has affected the parties' economic life and cases in which the fault so violates societal norms that continuing the economic bonds between the parties would confound notions of simple justice. The former may be considered in the calculation of alimony and the latter in connection with the initial determination of whether alimony should be allowed at all. We likewise hold that marital fault is irrelevant to a counsel fee award.

## I

The facts and procedures that gave rise to this appeal are as follows: Plaintiff, Brenda Mani and defendant, James Mani met in 1970 when she went to work for him in his seasonal amusement business on the Seaside Heights boardwalk. James, a college graduate, was at the time, a half-owner of the boardwalk business and a partner in a travel agency in Florida that later failed; Brenda was a college student. Brenda graduated in 1971 and taught preschool for two years while working with James at his business during the summer.

Before the parties were married in 1973, they purchased their first home at 400 Lexington Avenue in Toms River for $30,000. They jointly contributed $5,000 or $6,000 out of profits from the boardwalk business to buy the property. The balance of the purchase price was financed by a $25,000 mortgage held by Brenda's father. The house was purchased in Brenda's name with the intention that it would be used as the marital home.

After their wedding, the parties, who have no children, worked full time together "side by side" at the boardwalk business 100 hours a week, from Memorial Day through Labor Day each year. They also worked weekends in the fall, over Christmas, and in the late spring but spent the remaining months at trade shows or vacationing in Florida and Mexico.

During the early years of the marriage, Brenda's father gave her and her siblings significant gifts of money and investments, including checks for $10,000 a year. Brenda also received tax-free bonds from her father, which, per her father's instructions, were always kept solely in her name.

In 1981, Brenda received a gift of stock from her father in a family-owned business, Ultimate Corporation, that later traded publicly. As a condition of the Ultimate stock gift, Brenda's father required each of his children and their spouses to sign a waiver stating that the spouses were not entitled to share in the stock. Over the years, the stock rose in value and split several

times, eventually appreciating to $1.7 million in 1991. Brenda's investment income was needed to pay for the couple's expenses because income from the boardwalk business was not enough to support their comfortable lifestyle.

At some point Brenda began to sell her shares of Ultimate stock and, with the proceeds, purchased tax-free bonds in her own name. According to Brenda, she made those stock sales under the direction and advice of her father. Although she discussed her investments with James, Brenda testified that she made all final decisions about investing only after speaking with her broker and financial adviser. James, on the other hand, claimed that he was a knowledgeable investor whose ideas were the impetus for the stock sales.

In the early 1980's, Brenda's father formed a partnership called BAS for his five children and made investments of bonds and stocks in the BAS account. Every year, Brenda received roughly $40,000 from the partnership and the parties used that money for living expenses. In 1987, Brenda liquidated her interest in BAS in an amount just over $500,000, which she then placed in a stock account. Again, the parties dispute the role of James's financial advice in Brenda's decision to liquidate the stock.

In 1986, the parties purchased a second home in Toms River for $145,000 using proceeds from Brenda's Ultimate Stock and $129,000 from the sale of the Lexington Avenue house. That property, at 22 Central Avenue, was conveyed to the parties as husband and wife. Later, title was transferred to Brenda. The parties razed the existing house on that lot and built another in its place, ultimately spending between $500,000 and $750,000 in improvements on a lavish new home.

In addition to the house on Central Avenue, Brenda purchased vacation and rental properties in Florida with funds generated from her investments. She testified that the Florida properties were ultimately a financial loss and that, as a result, she sold them to pay her mortgage.

In 1993, when they were in their 40's, the parties retired from the boardwalk business and lived, in the words of the trial judge, an "extravagant" lifestyle almost exclusively out of Brenda's investment income. According to the parties, the monthly budgetary expenses of their household ranged from $7,360 to $13,143. Following the conclusion of the boardwalk operation, James, who had obtained a real estate license in Florida, worked briefly for real estate brokers. Although he provided a few referrals, he never showed a property for the firms and earned only about $20,000 in income in all.

The couple spent seven years together in retirement before Brenda discovered that her husband was having an affair with a woman with whom the parties socialized. Brenda filed a complaint for divorce alleging adultery and extreme cruelty. The trial judge granted James's motion for *pendente lite relief*, awarding $1,006 per week as spousal support and $7,000 as counsel fees, subject to allocation at the time of the final hearing.

The case proceeded to trial. James claimed entitlement to a permanent alimony award of $68,320 per year and Brenda sought to deny alimony altogether. By the time of trial, Brenda's investment assets were valued at $2.4 million. James's assets consisted of an IRA with a value of $80,000 as of 1999. He also had a partial interest in accounts held jointly by the couple and a shared interest in property from his father's estate valued at $50,000.

The trial judge determined that the property at 22 Central Avenue, which at the time of trial was under contract for sale for $500,000, was subject to equitable distribution but that Brenda's remaining assets were immune.

With regard to Central Avenue, the judge determined that James was entitled to thirty percent of the net proceeds ($141,000). In immunizing Brenda's remaining assets from distribution, the judge found that James's investment advice was "of little significance and import" and that it did not contribute to the growth of Brenda's assets. The judge also denied James's request for counsel fees.

With respect to alimony, the judge awarded James $610 per week based "in substantial part on the defendant's economic dependency." In reaching that conclusion, the judge attributed to James the ability to earn a minimum of $25,000 annually and denominated the alimony award as necessary to maintain the marital standard of living.

James appealed, claiming that the alimony award was insufficient to maintain the marital standard. He contended that even with the additional $25,000 earning capacity attributed to him by the trial judge, he would still be $4,000 short each month in meeting his self-described budgetary needs. He also argued that the distribution of the marital residence was inequitable because he was entitled to half of the sale proceeds, and that he should have been awarded counsel fees based on his need, good faith, and Brenda's superior ability to pay.

Brenda cross-appealed, arguing that James was not entitled to any alimony and should have received no more than sixteen percent of the proceeds from the marital residence because that was the percentage of the purchase price attributable to the sale of the house on Lexington Avenue. She further contended that alimony was inappropriate because James did not contribute non-remunerative activities to the marriage, and his economic dependency was not occasioned by the marriage, but by his own "indolence."

The Appellate Division affirmed and held that there was sufficient credible evidence in the record to support the trial judge's permanent alimony award; that "though the alimony award may be insufficient for defendant to maintain his relaxed marital lifestyle, the reduction in his living standard is justified, in part, by the finding that plaintiff established he was adulterous and committed acts of extreme cruelty;" that the trial judge did not abuse his discretion in allocating the parties' interests in the property at 22 Central Avenue; and that the denial of the counsel fee application was proper in light of the substantial *pendente lite* award and the finding of marital fault.

In reaching its conclusions, the court observed that "[t]he Manis' standard of living was not the result of the parties' joint efforts, but rather solely due to gifts from plaintiff's father." The panel also noted that although the trial court did not specifically mention adultery and extreme cruelty as factors in the alimony analysis, it did find that the Brenda had proven the grounds asserted in her complaint. According to the Appellate Division, James's adultery was significant and "his marital indiscretions warrant consideration in the amount of that award." The court also cited marital fault as a factor in the denial of counsel fees.

We granted James's petition for certification on issues of alimony and counsel fees, *Mani v. Mani*, 178 *N.J.* 453, 841 *A.2d* 91 (2004), and accorded *amicus* status to the New Jersey State Bar Association.

## II

James asks us to establish, as a rule of law, that in modern matrimonial practice, fault should play no part in an alimony determination or in an award of counsel fees. He contends that, as a matter of practice, courts are abiding by that rule and that the Appellate Division decision has upended the *status quo* by wrongly interjecting fault into the equation.

Brenda counters that *N.J.S.A.* 2A:34–23(b) gives courts discretion to "consider any other factors which the court may deem relevant" in arriving at an alimony decision, including marital fault. However, she candidly concedes that the present practice is to focus on the finances of the parties and rarely involves fault.

With respect to counsel fees, she acknowledges that marital fault is not a consideration and argues that the real reason for the denial of fees in this case was the $7,000 *pendente lite* award, the $141,000 in equitable distribution, and the failure of James to submit an Affidavit of Services.

*Amicus Curiae* urges us to rule that fault should not be a factor in the determination of alimony except in the most egregious

circumstances and that the focus of alimony should remain, as is the present practice, on the parties' financial circumstances.

## III

We turn first to the question of whether fault should be considered in an alimony analysis.

## A.

The history of alimony is instructive. In early England, two forms of marital dissolution existed. The most common was an ecclesiastical divorce from bed and board (*a mensa et thoro*). Robert Kirkman Collins, *The Theory of Marital Residuals: Applying An Income Adjustment Calculus to the Enigma of Alimony*, 24 *Harv. Women's L.J.* 23, 28 (2001). In reality that "divorce" was a legal separation that, in accordance with religious teaching on the indissolubility of marriage, did not terminate the marital relationship. John Witte Jr., *The History and Evolution of Marriage From Sacrament to Contract: Marriage, Religion and Law in Western Tradition* 156, 160–61 (1997). The other form—a civil divorce (*a vinculo matrimonii*)—which literally means severing the chains of matrimony, although technically available, was extremely rare because it required an act of Parliament. 13 *Halsbury's Laws of England*, 245 (1975).

Alimony was granted only in the former class of cases on the theory that husband was obliged to continue to support his wife as long as they remained married. Collins, *supra*, 24 *Harv. Women's L.J.* at 28–29 (2001). Somehow, with the passage of time, the distinction between true divorce and mere separation was obliterated and alimony began to be awarded in all cases. No rationale was advanced to explain why parties, who were no longer married, remained economically bound to one another. As one legal scholar put it:

By the time that matrimonial law reform in Great Britain created universally accessible civil divorce in the mid-nineteenth century, the concept of alimony was so well-accepted that it was carried over and applied to those new cases where the

marriage itself was actually ending, without apparent reflection or explanation as to why it should continue once the marital relationship had been extinguished. Section 32 of the Matrimonial Causes Act [of] 1857 gave the judge discretion to order a husband to provide for his wife even after the marriage had ended in an amount reflecting her own wealth, his own means, and their respective conduct during the marriage. Posterity was not, however, provided with a rationale. [*Ibid.*]

Divorce based on the English practice was available in the American colonies from the earliest times. *Maynard v. Hill,* 125 *U.S.* 190, 206, 8 *S.Ct.* 723, 727, 31 *L.Ed.* 654, 657 (1888). The concept of alimony also carried over. Again, as had been the case in England, the reason for alimony, outside the legal separation scenario, remained an enigma. 2 Homer Harrison Clark, *The Law of Domestic Relations in the United States,* 257–58 (2d ed.1988). That lack of clarity regarding the theoretical underpinning of post-divorce alimony explains why, although alimony is now awarded in every jurisdiction, Collins, *supra,* 24 *Harv. Women's L.J.* at 31, there is no consensus regarding its purpose.

Indeed, many distinct explanations have been advanced for alimony. *Id.* at 23. They include its characterization as damages for breach of the marriage contract, Margaret F. Brinig & June R. Carbon, *The Reliance Interest in Marriage and Divorce,* 62 *Tul. L.Rev.* 855, 882 (1988); as a share of the benefits of the marriage partnership, *Rothman v. Rothman,* 65 *N.J.* 219, 229, 320 *A.2d* 496 (1974); as damages for economic dislocation (based on past contributions), Elisabeth M. Lands, *Economics of Alimony,* 7 *J. Legal. Stud.* 35 (1978); as damages for personal dislocation (foregoing the chance to marry another), Lloyd Cohen, *Marriage, Divorce, Quasi Rents; Or, "I Gave Him the Best Years of My Life,"* 16 *J. Legal Stud.* 267, 276 (1987); as compensation for certain specific losses at the time of the dissolution, A.L.I., *Principles of Law of Family Dissolution: Analysis and Recommendations,* 8 *Duke J. Gender L. & Pol'y* 1, 28 (2001); as deterrence or punishment for marital indiscretion, Brinig & Carbone, *supra,* 62 *Tul. L.Rev.* at 860–61; and as avoidance of a drain on the public fisc, *Miles v. Miles,* 76 *Pa.* 357, 358 (1874).

Obviously, some of those purposes favor consideration of fault and some disfavor it. Thus, for example, in jurisdictions that continue to consider alimony as a punishment for marital indiscretion, deterrence against bad behavior, or damages for breach of the marital contract, fault logically figures into the calculus. Contrariwise, in those jurisdictions that view alimony solely in economic terms and prohibit its characterization as punitive, fault would not likely be considered as a weight at all. In other words, the purpose that is identified by a jurisdiction as the rationale for awarding alimony is closely connected to the question whether fault should be a factor in its calculation.

New Jersey cases have long expressed the view that alimony is neither a punishment for the payor nor a reward for the payee. *Aronson v. Aronson*, 245 *N.J.Super.* 354, 364, 585 *A.2d* 956 (App.Div.1991); *Turi v. Turi*, 34 *N.J.Super.* 313, 322, 112 *A.2d* 278 (App.Div.1955); *O'Neil v. O'Neil*, 18 *N.J. Misc.* 82, 89, 11 *A.2d* 128(Ch.), *aff'd*, 127 *N.J. Eq.* 278, 12 *A.2d* 839 (E. & A.1940). Rather, it is an economic right that arises out of the marital relationship and provides the dependent spouse with "a level of support and standard of living generally commensurate with the quality of economic life that existed during the marriage." *Stiffler v. Stiffler*, 304 *N.J.Super.* 96, 99, 698 *A.2d* 549 (Ch.1997) (quoting *Koelble v. Koelble*, 261 *N.J.Super.* 190, 192–93, 618 *A.2d* 377 (App.Div.1992)). If that were our sole benchmark, resolving the issue whether fault should be an alimony consideration would be relatively simple. The answer would be "no." There is, however, more to consider.

## B.

*N.J.S.A.* 2A:34–23(b) provides that in all divorce actions "the court may award one or more of the following types of alimony: permanent alimony; rehabilitative alimony; limited duration alimony or reimbursement alimony to either party." When ordering alimony, a "court *shall* consider" a non-exclusive list of enumerated factors:

(1) The actual need and ability of the parties to pay;

(2) The duration of the marriage;

(3) The age, physical and emotional health of the parties;

(4) The standard of living established in the marriage and the likelihood that each party can maintain a reasonably comparable standard of living;

(5) The earning capacities, educational levels, vocational skills, and employability of the parties;

(6) The length of absence from the job market of the party seeking maintenance;

(7) The parental responsibilities for the children;

(8) The time and expense necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment, the availability of the training and employment, and the opportunity for future acquisitions of capital assets and income;

(9) The history of the financial or non-financial contributions to the marriage by each party including contributions to the care and education of the children and interruption of personal careers or educational opportunities;

(10) The equitable distribution of property ordered and any payouts on equitable distribution, directly or indirectly, out of current income, to the extent this consideration is reasonable, just and fair;

(11) The income available to either party through investment of any assets held by that party;

(12) The tax treatment and consequences to both parties of any alimony award, including the designation of all or a portion of the payment as a non-taxable payment; and

(13) Any other factors which the court may deem relevant.

[*N.J.S.A.* 2A:34–23(b).]

As is obvious, the words "marital fault" and "responsibility for the breakdown in the marriage" do not appear in the statute, although the so-called "catch all category" arguably permits a court to consider "any other factor" it may "deem relevant." *N.J.S.A.* 2A:34–23(g) further guides the court's determination of alimony:

In all actions for divorce other than those where judgment is granted solely on the ground of separation the court *may consider* also *the proofs made* in establishing such ground in determining an amount of alimony or maintenance that is fit, reasonable and just.

[*N.J.S.A.* 2A:34–23(g) (emphasis added).]

The genesis of that provision bears on the issue before us.

## C.

In the late 1960's, the California Legislature "launched the modern-day reform movement in divorce laws by adopting the

first no-fault divorce law in the United States and eliminating the concept of fault in marriage dissolution actions." Larry R. Spain, *The Elimination of Marital Fault in Awarding Spousal Support: The Minnesota Experience*, 28 *Wm. Mitchell L.Rev.* 861, 861 (2001). New Jersey followed suit in 1971 when it enacted a comprehensive divorce reform package (*L.* 971, *c.* 212, (the "Divorce Reform Act")), that endeavored to "adequately respond to the felt needs of our present day society" in the area of divorce law. *Painter v. Painter*, 65 *N.J.* 196, 203, 320 *A.*2d 484 (1974). Before the passage of the Act, the Legislature created the Divorce Law Study Commission ("Commission") with an eye toward incorporating into the law "modern concepts" of divorce and "sociological aspects of marriage, including many changes in viewpoint." *L.* 1967, *c.* 57 (amended by *L.* 1968, *c.* 170 and *L.* 1969, *c.* 25); *see also Painter, supra,* 65 *N.J.* at 203, 320 *A.*2d 484 (recounting history of New Jersey's revision of divorce law). The Commission issued a *Final Report* that contained findings about existing divorce law in New Jersey, and proposed a Divorce Reform Bill. *See Divorce Law Study Commission, New Jersey, Final Report to the Governor and The State* (1970) [hereinafter Final Report]. "In very large part" the resulting statute, *N.J.S.A.* 2A:34–23, was "based upon the proposed Divorce Reform Bill" contained in the Final Report. *Painter, supra,* 65 *N.J.* at 203–04, 320 *A.*2d 484.

Because New Jersey law prior to 1971 only provided for divorce on the grounds of fault, the focus of the Commission was the need for legal recognition of no-fault divorce on grounds of separation. *Final Report, supra,* at 5–6, 99–100. The Commission proposed such a new ground "where there is no prospect for reconciliation" between the parties. *Id.* at 5. That recommendation was based on the policy objective of "mak[ing] it legally possible [for parties] to terminate dead marriages" without requiring litigants to "resort to the hypocrisy of accusing one or the other of a marital wrong recognized by our present statutes." *Id.* at 6. The Commission also concluded that "mutuality of fault should not be a bar to divorce" because such a restriction would only serve as an unjustified "punishment by the State." *Ibid.*

Presumably the Legislature agreed with those conclusions because a central feature of the final Divorce Reform Act was the allowance of divorce on no-fault grounds. *Painter, supra,* 65 *N.J.* at 205, 320 *A.*2d 484. That statutory initiative gave couples in New Jersey the right to divorce after eighteen months of separation, regardless of which party caused the breakdown in the marriage. *N.J.S.A.* 2A:34–2(d). As we noted in *Painter,* the separation provision represented a "move away from the concept of fault on the part of one spouse as having been solely responsible for the marital breakdown, toward a recognition that in all probability each party has in some way and to some extent been to blame." 65 *N.J.* at 205, 320 *A.*2d 484.

However, unlike the approach taken by some other jurisdictions that eliminated fault grounds for divorce altogether, the Commission Report stated, "[t]he Commission does *not* recommend, at this time, the complete elimination of fault as a consideration in marriage termination." *Final Report, supra,* at 6–7. The Legislature followed suit, preserving the traditional fault-based grounds for divorce, although "somewhat liberalizing the requisites for their availability." *Id.* at 205–06, 320 *A.*2d 484.

In addition to the Commission's no-fault based proposals, the *Final Report* and proposed bill also briefly addressed the relationship between fault and alimony. The Commission noted that "fault, where so asserted as a ground for relief, *will be a proper consideration for the judiciary in dealing with alimony and support." Id.* at 7 (emphasis added). The proposed bill language presented by the Commission reflected that position:

In all actions for divorce, divorce from bed and board, or nullity, the court may award alimony to either party and in so doing shall consider the actual need and ability to pay of the parties and the duration of the marriage. In *all actions for divorce other than those where judgment is granted solely on the ground of separation the court may consider also the proofs made in establishing such ground in determining an amount of alimony* or maintenance that is fit, reasonable, and just.

[*Id.* at 93, 112 (stating proposed language for *N.J.S.A.* 2A:34–23)(emphasis added).]

In its comments on the bill's alimony provisions, the Commission explained:

[A]n attempt is made by [the proposed language] to direct the courts' attention to economic factors and the duration of the marriage as primary considerations in setting an amount of alimony that is fit, reasonable, and just. The court retains discretion, the factors enumerated are but guidelines, but their importance is stressed.

The last sentence of the proposed amendment permits the court to deny alimony to a spouse who is guilty of one of the fault grounds for divorce. As long as fault grounds are retained, it is traditional logic that fault also should affect judicial discretion in awarding alimony. After further study a new Commission may conclude that fault has no place in either the provision of grounds for divorce or in determining alimony but for the time being the substance of existing law is retained.

[*Final Report, supra,* at 94–95 (emphasis added).]

In an Appendix to the *Final Report*, the Commission recognized the tension between considering fault in awarding alimony and the modern notion of no-fault divorce. *Id.* at 129–30. According to the Commission, "the concept of fault is prominent in the determination of alimony" in many jurisdictions and, therefore, litigating the question of fault may be "necessary." *Id.* at 130. Although the Commission noted that recent trends gave greater weight to other factors, such as "the needs of the parties and their private estates and earning capacities," it apparently viewed the retention of fault-based grounds for divorce as an obstacle to the development of that trend in New Jersey. It concluded that "perhaps the penalty should fit the 'crime,' i.e., the flagrant offender, whether plaintiff or defendant (husband or wife) may be subject to equitable principles when alimony, custody and property rights are determined." *Id.* at 8. The Commission did not, however, further define flagrancy.

The Legislature adopted the relevant language in the Commission's proposed bill, word for word, in *N.J.S.A.* 2A:34–23(g), evidencing its apparent intention that courts should have discretion to consider fault in awarding alimony. Whether it incorporated the notion of the "flagrant offender" referred to by the Commission is unclear, as is the Legislature's intent in respect of how the court is to calculate the impact of fault on an alimony award.

Since the enactment of *N.J.S.A.* 2A:34–23, and despite the Commission's stated hope that further study would refine the subject, no subsequent body has been charged with the duty of revisiting the fault-alimony connection and the language of the statute has remained unchanged in the face of several statutory amendments over the years.[1] That is the legislative backdrop of our inquiry.

### D.

Judicial interpretations of *N.J.S.A.* 2A:34–23(g) have varied. In *Greenberg v. Greenberg*, 126 *N.J.Super.* 96, 99–100, 312 *A.*2d 878 (App.Div.1973), the trial court *increased* the amount of alimony to be awarded to an economically dependent wife because her husband's extreme cruelty caused the dissolution of the marriage. The Appellate Division reversed, characterizing the economic roots of alimony as its sole basis, holding *N.J.S.A.* 2A:34–23(g) fault neutral and declaring that it "does not bespeak legislative intendment that marital misconduct may generate an award for alimony *in excess* of that which might be supported by long-established and traditional bases for such grants." *Greenberg, supra,* 126 *N.J.Super.* at 99, 312 *A.*2d 878 (emphasis added).

The following year, in *Chalmers v. Chalmers*, 65 *N.J.* 186, 194 n. 4, 320 *A.*2d 478 (1974), we paraphrased the *Final Report* and observed that although it is not an appropriate criterion for consideration in equitable distribution, "fault where so stated as a ground for relief, will be a proper consideration for the judiciary in dealing with alimony and support."

Thereafter, *Mahne v. Mahne*, 147 *N.J.Super.* 326, 329, 371 *A.*2d 314 (App.Div.1977), presented the inverse of *Greenberg* insofar as it involved a proposal to bar alimony altogether to a blameworthy spouse. In *Mahne*, a divorce was granted to the husband on the fault-based ground of adultery after the wife had an affair with

---

[1] The statute was amended in 1980, 1983, 1988, 1997, and 1999. *See N.J.S.A.* 2A:34–23.

her husband's "best friend." *Id.* at 327–28, 371 *A.*2d 314. The trial judge awarded alimony to the wife in the amount of $300 a month. *Ibid.* The husband appealed, arguing that the award was excessive in light of his wife's marital infidelity. *Id.* at 328, 371 *A.*2d 314. The Appellate Division agreed, and reversed the grant of alimony based on the wife's fault.

Shortly thereafter, in *Nochenson v. Nochenson,* 148 *N.J.Super.* 448, 449–50, 372 *A.*2d 1139 (App.Div.1977), the Appellate Division clarified its decision in *Mahne,* stating that, although dictum in that case could be read to support an alimony bar based on fault, the holding actually "went no further than accepting fault as a 'consideration' or factor in determining the grant or denial of alimony." *Nochenson* suggested that "lurid details" about the nature of Mrs. Mahne's adultery—though largely unspecified—justified a denial of alimony. *Ibid.*

Later cases have taken the lead of *Chalmers* and *Nochenson* and recognized that fault may be considered as one factor in an alimony analysis but have moved in the direction of circumscribing such consideration. For example, *Lynn v. Lynn,* 165 *N.J.Super.* 328, 333, 398 *A.*2d 141 (App.Div.1979), involved a wife who "committed, by her admission, many acts of adultery, beginning a few months after her husband deserted the marital residence." The trial judge ruled in favor of the husband, a physician, and denied alimony altogether to the wife, who earned only $50 a week publishing a newsletter. *Id.* at 346. In reversing and remanding for reconsideration of alimony, the Appellate Division cited *Chalmers* and the *Final Report,* and noted that although marital fault is a proper consideration, "Mrs. Lynn's admitted post-desertion sexual conduct was in our view hardly such egregious fault as to equitably preclude her right to claim alimony under the *Mahne–Nochenson* standard." *Id.* at 336–37, 398 *A.*2d 141. *Lynn* focused on the economic considerations that arise in the dissolution of a marriage, stating "that a paramount reason for alimony is to permit a wife to share in the economic rewards occasioned by her husband's income level (as opposed merely to assets accumulated),

reached as a result of their combined labors, inside and outside the home." *Ibid.* (internal citation and quotation marks omitted).

The Appellate Division employed a similar analysis in *Gugliotta v. Gugliotta,* 164 *N.J.Super.* 139, 140, 395 *A.*2d 901 (App.Div.1978), where the husband argued that the trial judge erred in awarding alimony to the adulterous wife. In affirming, the Appellate Division acknowledged that although fault is a factor for consideration, the circumstances of the adulterous activity in that case did not warrant a denial of alimony. *Ibid.* Rather, the court suggested that marital fault comes into play only when it relates to the economics of a breakdown in the marriage or when there is egregious harm to the other party. In addition, that panel suggested that fault is a less important factor than "the earning capacity of the parties and the length of the marriage." *Id.* at 141, 395 *A.*2d 901. *See also Ruprecht v. Ruprecht,* 252 *N.J.Super.* 230, 240, 599 *A.*2d 604 (Ch.Div.1991) (holding discovery regarding alimony limited to economic aspect of defendant's adulterous acts).

We commented on the limited role of fault in an alimony analysis in *Kinsella v. Kinsella,* 150 *N.J.* 276, 285, 696 *A.*2d 556 (1997), where the husband filed for divorce on the ground of the wife's extreme cruelty, including allegations of verbal abuse and "bizarre behavior." The wife counterclaimed on the ground of extreme cruelty, including allegations of physical abuse. *Id.* at 286, 696 *A.*2d 556. Although the issue before us in *Kinsella* was not an alimony award (the case involved the release of psychological records), we discussed the significance of fault in matrimonial proceedings after passage of the Divorce Reform Act, noting that "the practical consequences of succeeding in a divorce action on fault-based grounds, as opposed to separation, are *minimal.*" *Id.* at 313–14, 696 *A.*2d 556 (emphasis added). After recounting that fault is irrelevant to equitable distribution, child support and custody, we addressed *N.J.S.A.* 2A:34–23 and stated that "the focus of the decision regarding alimony is *generally* on the financial circumstances of the parties" and that "in today's practice, marital fault *rarely* enters into the calculus of an alimony award."

*Kinsella, supra,* 150 *N.J.* at 314–15, 696 *A.*2d 556 (emphasis added).

Recapping, although our case law has consistently recognized that, under our statutory scheme, fault may be considered in calculating alimony, for over a quarter of a century, courts have declined to place their imprimatur on a wide-ranging use of fault in that context. *Ruprecht,* for example, adopted a narrow model allowing consideration of economic fault only. *Lynn* and *Gugliotta* refused to consider non-egregious fault. *Kinsella* attempted to reconcile the statute with the cases by pointing out that the "focus of the decision regarding alimony is *generally* on the *financial circumstances* of the parties"; "the practical consequences of succeeding ... on fault based grounds ... are *minimal*"; and "marital fault *rarely* enters into the calculus of an alimony award." *Id.* at 314–15, 696 *A.*2d 556 (emphasis added).

We reaffirm *Kinsella*'s approach. The thirteen alimony factors listed in *N.J.S.A.* 2A:34–23(b) clearly center on the economic status of the parties. That is the primary alimony focus. However, the Legislature adopted both the spirit and the language of the *Final Report* that stated that "fault, where so asserted as a ground for relief will be a *proper consideration* for the judiciary in dealing with alimony and support." (Emphasis added). Thus in *Kinsella* we rendered congruent those seemingly discordant themes by recognizing, on the one hand, the potential for considering fault, and on the other, the rarity of such use in an alimony analysis. That judicial gloss on the alimony statute has existed for over seven years, and reflects the direction of our jurisprudence for a much longer period. During that time, the Legislature has, on several occasions, undertaken to amend the divorce law in other respects. We take that as some indication that the Legislature is satisfied with the general approach adopted in *Kinsella* and its forebears. *See Massachusetts Mut. Life v. Manzo,* 122 *N.J.* 104, 116, 584 *A.*2d 190 (1991)(stating Legislature's failure to modify judicial determination is some evidence of legislative support for judicial construction of statute).

## E.

It is noteworthy that the statutory provision permitting consideration of "the proofs made" in a fault-based divorce does not specify how judges are to weigh proof of fault in establishing alimony. In order to avoid the exercise of wholly unguided discretion by trial judges and in the interest of uniformity and predictability in decision-making, our task in this case is to search for a principled approach to the relationship between fault and alimony consistent with legislative intent. To do so, we have scoured the approaches taken by our sister states. Many jurisdictions, without restriction, allow fault to be factored into an alimony award. *See, e.g., Allen v. Allen,* 648 *So.*2d. 359 (La.1994); *Hammonds v. Hammonds,* 597 *So.*2d 653 (Miss.1992); *Thames v. Thames,* 191 *Mich.App.* 299, 477 *N.W.*2d 496 (1991); *Hegge v. Hegge,* 236 *N.W.*2d 910 (N.D.1975). Many others prohibit any consideration of fault. *See, e.g., Oberhansly v. Oberhansly,* 798 *P.*2d 883 (Alaska 1990); *In re Marriage of Bultman,* 228 *Mont.* 136, 740 *P.*2d 1145 (1987); *In re Williams' Marriage,* 199 *N.W.*2d 339 (Iowa 1972). Those approaches are not particularly helpful because the legislative and judicial backdrop on which our case is to be considered does not justify an all-or-nothing approach.

We have looked, as well, at the words of legal writers on the subject. Like the states, they reflect the full spectrum of approaches. For example, one commentator argues that even in the era of no-fault divorce, there should be consideration of fault in determining alimony to morally coerce better marital conduct. Adrian M. Morse, Jr., *Fault: a Viable Means of Re–Injecting Responsibility in Marital Relations,* 30 *U. Rich. L.Rev.* 605, 651 (1996). Another contends that legal recognition of fault may "provide protection and compensation for victims of abuse or spousal trust." Barbara Bennett Woodhouse, *Sex, Lies and Dissipation: The Discourse of Fault in a No–Fault Era,* 82 *Geo. L.J.* 2525, 2529–30 (1994).

Other scholars counter that "the potentially valid functions of a fault principle are better served by the tort and criminal law, and

attempting to serve them through a fault rule risks serious distortions in the resolution of the dissolution action." Mark Ellman, *The Place of Fault in a Modern Divorce Law*, 26 *Ariz. St. L.J.* 773, 808–09 (1996). That view aligns with the most recent report of the American Law Institute on *Principles of the Law of Family Dissolution: Analysis and Recommendations, supra.* 8 *Duke J. Gender L. Pol'y* at 59. That report concluded that economic fault is a valid alimony factor, but that consideration of non-economic fault should be avoided because of its deleterious effect on the dissolution action. More particularly, the ALI report notes that, in a scheme such as ours, in which alimony has economic roots,

> ■ will be the unusual case in which the fairness of the result will be improved by a judicial inquiry into the relative virtue of the parties' intimate conduct. In some [cases] the result will become less fair. And the rules that invite such misconduct claims will surely increase the cost and degrade the process in many other cases, even those in which the claim is ultimately cast aside.
> [*Id.* at 60.]

■ We agree and hold that in cases in which marital fault has negatively affected the economic status of the parties it may be considered in the calculation of alimony. By way of example, if a spouse gambles away all savings and retirement funds, and the assets are inadequate to allow the other spouse to recoup her share, an appropriate savings and retirement component may be included in the alimony award.

Our conclusion flows purely from a relevance perspective. "Relevant evidence" is "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." *N.J.R.E.* 401; *see also State v. Wilson*, 135 *N.J.* 4, 13, 637 *A.*2d 1237 (1994) (noting that probative value of evidence is "tendency of evidence to establish the proposition that it is offered to prove"). Given the economic basis of alimony, there can be no quarrel over the notion that fault that has altered the financial status of the parties is relevant in an alimony case. *See, e.g., Noah v. Noah*, 491 *So.*2d 1124, 1126 (Fla.1986) (holding adultery not cognizable in alimony award unless it depleted family resources); *Williamson v. Williamson*, 367 *So.*2d 1016, 1019 (Fla.

1979) (holding court in alimony case may consider fault of one spouse in creating economic hardship facing couple).

The same relevance notion does not apply to the ordinary fault grounds for divorce that lurk in the margins of nearly every case and therefore those grounds should not be interjected into an alimony analysis. To do so would distort the application of the principles the Legislature has adopted to secure economic justice in matrimonial cases. Moreover, without concomitant benefit, considering non-economic fault can only result in ramping up the emotional content of matrimonial litigation and encouraging the parties to continually replay the details of their failed relationship. Not only is non-economic fault nearly impossible to factor into an alimony computation, but any attempt to do so would have the effect of generating complex legal issues regarding the apportionment of mutual fault, which is present in nearly all cases. That, in turn, would result in the protraction of litigation and the undermining of the goals of no-fault divorce, again without a corresponding benefit.[2]

■ Thus we hold that to the extent that marital misconduct affects the economic *status quo* of the parties, it may be taken into consideration in the calculation of alimony. Where marital fault has no residual economic consequences, it may not be considered in an alimony award.

## F.

■ The only exception to that rule is the narrow band of cases involving the kind of egregious fault alluded to in *Gugliotta* and *Lynn*. Although *Gugliotta* and *Lynn* did not define egregious fault, they left open its characterization as something more than

---

[2] Some non-economic fault may be compensated in appropriate cases by the filing of a tort claim. *See Tevis v. Tevis*, 79 *N.J.* 422, 434, 400 *A.2d* 1189 (1979) (recognizing interspousal tort actions); *Brennan v. Orban*, 145 *N.J.* 282, 305, 678 *A.2d* 667 (1996) (holding interspousal tort action to be addressed in matrimonial action).

ordinary fault. It seems to us that, in this context, egregious fault is a term of art that requires not simply more, or even more public acts of marital indiscretion, but acts that by their very nature, are different in kind. By way of example but not limitation, California has legislatively barred alimony payments to a dependent spouse who has attempted to murder the supporting spouse. *Cal. Fam. Code* § 4324. Deliberately infecting a spouse with a loathsome disease also comes to mind. Underlying those examples is the concept that some conduct, by its very nature is so outrageous that it can be said to violate the social contract, such that society would not abide continuing the economic bonds between the parties. In the extremely narrow class of cases in which such conduct occurs, it may be considered by the court, not in calculating an alimony award, but in the initial determination of whether alimony should be allowed at all.

## G.

In this case, there was no allegation that James's marital fault had any economic consequences or that it was, in any way, egregious. Indeed the trial judge did not weigh fault in the alimony calculus. Yet, the Appellate Division relied on his marital misconduct to justify the trial judge's alimony award. Because the alimony award was a close call, (the Appellate Division stating that it "may be insufficient" to support James in the marital life style), we do not know whether the court would have reached the same conclusion in the absence of the fault consideration. We therefore reverse and remand the case to the Appellate Division for reconsideration of alimony without regard to fault, giving due deference to the trial judge's findings and conclusions.

## IV

One final note on the alimony-fault intersection. This is nothing more than a case involving statutory interpretation. Neither the purposes underlying alimony, the words of the alimony statute, nor the legislative history behind the act can be said to provide

clear guidance as to the kind of fault that is to be considered in an alimony calculus. The dissent misperceives the Court's role in such a case—we are not free to abdicate our responsibility to interpret legislation consistent with its language and with precedent that supplies content to broad statutory pronouncements. Indeed, because our case law over the last thirty years has soundly rejected the wide-ranging use of fault and because the Legislature has declined to intervene, we take it that it is satisfied with the way our cases have construed the statute. This case codifies what has been the nearly universal practice in our courts. It is hard to fathom how the dissent can suggest that our lower courts' approach "has served us well" enough to warrant our inaction, and, at the same time, urge that we discard the very conclusion that most courts have reached: that ordinary fault should not play a part in an alimony award.

Finally, we reject the dissent's suggestion that the narrow use of fault we have approved today "will create far more mischief than it will ever resolve." Given the choice that has come to us as a result of a legislative ambiguity, affording matrimonial litigants more weapons to use against each other is not a decision we should make. By delimiting the kinds of fault that may be taken into account in an alimony calculus, we have not only created a template for uniformity and predictability in decision-making but have relieved matrimonial litigants and their counsel from the need to act upon the nearly universal and practically irresistible urge for retribution that follows on the heels of a broken marriage. How that will create "more mischief" than the endless trials that will inevitably flow out of the dissent's scheme, in which the opening salvo and concomitant response in every single matrimonial case will be a replay of the grievances of the marriage, is hard to fathom.

V

We turn next to the issue of attorneys' fees. In awarding attorney's fees, *N.J.S.A.* 2A:34–23 requires a court "to consider

the factors set forth in the court rule on counsel fees, the financial circumstances of the parties, and the good or bad faith of either party." *R.* 5:3–5(1)(c) in turn provides:

(c) **Award of Attorney Fees.** Subject to the provisions of R. 4:42–9(b), (c), and (d), the court in its discretion may make an allowance, both pendente lite and on final determination, to be paid by any party to the action, including, if deemed to be just, any party successful in the action, on any claim for divorce, nullity, support, alimony, custody, parenting time, equitable distribution, separate maintenance, enforcement of interspousal agreements relating to family type matters and claims relating to family type matters in actions between unmarried persons. A pendente lite allowance may include a fee based on an evaluation of prospective services likely to be performed and the respective financial circumstances of the parties. The court may also, on good cause shown, direct the parties to sell, mortgage, or otherwise encumber or pledge marital assets to the extent the court deems necessary to permit both parties to fund the litigation. In determining the amount of the fee award, the court should consider, in addition to the information required to be submitted pursuant to R. 4:42–9, the following factors: (1) the financial circumstances of the parties; (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party; (3) the reasonableness and good faith of the positions advanced by the parties; (4) the extent of the fees incurred by both parties; (5) any fees previously awarded; (6) the amount of fees previously paid to counsel by each party; (7) the results obtained; (8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and (9) any other factor bearing on the fairness of an award.

*R.* 4:42–9(b) further provides in relevant part:

(b) **Affidavit of Service.** Except in tax and mortgage foreclosure actions, all applications for the allowance of fees shall be supported by an affidavit of services addressing the factors enumerated by RPC 1.5(a). The affidavit shall also include a recitation of other factors pertinent in the evaluation of the services rendered, the amount of the allowance applied for, and an itemization of disbursements for which reimbursement is sought. If the court is requested to consider the rendition of paraprofessional services in making a fee allowance, the affidavit shall include a detailed statement of the time spent and services rendered by paraprofessionals, a summary of the paraprofessionals' qualifications, and the attorney's billing rate for paraprofessional services to clients generally. No portion of any fee allowance claimed for attorneys' services shall duplicate in any way the fees claimed by the attorney for paraprofessional services rendered to the client. For purposes of this rule, paraprofessional services shall mean those services rendered by individuals who are qualified through education, work experience or training who perform specifically delegated tasks which are legal in nature under the direction and supervision of attorneys and which tasks an attorney would otherwise be obliged to perform.

■ In a nutshell, in awarding counsel fees, the court must consider whether the party requesting the fees is in financial need;

whether the party against whom the fees are sought has the ability to pay; the good or bad faith of either party *in pursuing or defending* the action; the nature and extent of the services rendered; and the reasonableness of the fees. *Williams v. Williams,* 59 *N.J.* 229, 233, 281 *A.*2d 273 (1971) (stating when awarding counsel fees "courts focus on several factors, including wife's need, husband's financial ability to pay and wife's good faith in instituting or defending action"); *Mayer v. Mayer,* 180 *N.J.Super.* 164, 169–70, 434 *A.*2d 614 (App.Div.1981) (noting award of counsel fees involves critical review of nature and extent of services rendered, complexity and difficulty of issues determined, and reasonableness and necessity of time spent by counsel rendering legal services).

The parties agree, as do we, that bad faith for counsel fee purposes relates only to the conduct of the litigation and that there is nothing in the statutory scheme to suggest that the underlying issue of marital fault is a consideration. *Yueh v. Yueh,* 329 *N.J.Super.* 447, 460–61, 748 *A.*2d 150 (App.Div.2000); *Borzillo v. Borzillo,* 259 *N.J.Super.* 286, 292–93, 612 *A.*2d 958 (Ch.Div. 1992).

Here, the trial judge did not explain the denial of James's application for counsel fees. Nevertheless, the Appellate Division, pursuant to an exercise of its original jurisdiction (*R.* 2:10–5) affirmed the denial for the following reasons:

> The judge ordered plaintiff to advance to defendant counsel fees in the amount of $7,000 in his *pendente lite* order dated March 23, 2001. We conclude from the evidence and the judge's other findings that [James] was financially able to pay his counsel. In light of the substantial *pendente lite* award *and the proved grounds for divorce,* the judge did not abuse his discretion in ordering each party to pay their own attorney.

[ (Emphasis added).]

We take the "proved grounds for divorce" language to be an unwarranted reference to marital fault. We therefore reverse the order of the Appellate Division and remand the case to that court to reconsider the issue of alimony without regard to fault.

We are equally concerned about the claim that no Affidavit of Services was proffered by James. It is curious to us that neither the trial judge nor the Appellate Division commented on the absence of an Affidavit, if indeed that is the case. It may be that, because there was a legitimate issue over whether counsel fees were warranted at all, the parties agreed to allow the filing of an affidavit if the judge was theoretically inclined to grant fees. We simply do not know. Because the issue of counsel fees has already been remanded for reconsideration without regard to fault, we expect the Appellate Division to resolve the issue of the missing affidavit as well.

## VI

The judgment of the Appellate Division is reversed. The matter is remanded for reconsideration of the issues of alimony and counsel fees based on the principles to which we have adverted.

WALLACE, JR., concurring.

I concur in the result. Unlike the majority, I find no need to refine and expand upon when it is appropriate to use marital fault in determining an alimony award. I am satisfied with the view we expressed in *Kinsella, supra,* that "marital fault rarely enters in the calculus of an alimony award." 150 *N.J.* at 315, 696 *A.*2d 556. Our trial judges have consistently complied with that admonition as evidenced by the paucity of appeals in which fault is an issue in determining the amount of the award of alimony.

Moreover, in the present case, the trial judge did not consider fault in computing the alimony award. I find no abuse of discretion in that regard.

In all other respects I concur with the majority opinion.

Justice RIVERA–SOTO, concurring in part and dissenting in part.

Today this Court announces two new rules of law concerning the interpretation and application of the Divorce Act of 1971, as

amended, *N.J.S.A.* 2A:34–1, *et seq.*: (1) in the exercise of their statutory discretion in determining an alimony award, trial courts are now barred from considering marital fault save for "two narrow instances: cases in which the fault has affected the parties' economic life and cases in which the fault so violates societal norms that continuing the economic bonds between the parties would confound notions of simple justice," *ante,* 183 *N.J.* at 72, 869 *A.*2d at 905 and (2) in the trial court's exercise of statutory discretion in awarding counsel fees, "marital fault is irrelevant to a counsel fee award." *Ibid.* Preliminarily, I address these issues in that order.

My main disagreement with the majority stems from its conclusion that trial courts are to be restricted in their computation of alimony awards solely to the types of fault the majority finds abhorrent. According to the majority, this result is compelled by what the majority views as its obligation to "reaffirm *Kinsella's* [*Kinsella v. Kinsella,* 150 *N.J.* 276, 696 *A.*2d 556 (1997)] approach." *Ante,* 183 *N.J.* at 88, 869 *A.*2d at 915. I simply cannot read *Kinsella's* dicta in the same manner or with the same import the majority does. I also cannot ignore the plain reading of a statute, disregard completely its clear legislative history and jettison over thirty years of our own jurisprudence. Further, this Court is not the proper forum for the relief sought, as it should be sought from the Legislature. Finally, even assuming that the majority's legal analysis is correct, that the majority's conclusion is consonant with the statute and its legislative and decisional history, and that this branch of government is the proper forum for this decision, the construct tendered by the majority is unworkable.

As to the latter issue, while I concur with the majority's conclusion that "marital fault is irrelevant to a counsel fee award," I do so for reasons different from those espoused by the majority. In my view, the only factors relevant to a counsel fee award are those specifically enumerated in the Divorce Act of 1971. I also concur with the majority's conclusion that it is unclear whether the

time for the filing of an affidavit of services had passed and, hence, a remand on that issue is appropriate.

## I.

The majority's recitation of the facts fairly presents the context for this matter. I highlight only the fact that plaintiff and defendant financed their early-retirement marital lifestyle from over $2,000,000 in gifts plaintiff's father gave solely to her over time and which, at her father's direction, plaintiff retained as her separately titled property.

## II.

I address first the limited issue on which I concur in the majority's conclusions: that marital fault is irrelevant to an award of counsel fees. In my view, however, that conclusion does not end the inquiry. The trial court's obligation to consider an award of counsel fees is rooted in the Divorce Act of 1971 itself:

> *Whenever any other application is made* to a court *which includes an application for* pendente lite or *final award of counsel fees, the court shall determine the appropriate award for counsel fees,* if any, at the same time that a decision is rendered on the other issue then before the court *and shall consider the factors set forth in the court rule on counsel fees, the financial circumstances of the parties, and the good or bad faith of either party.*
>
> [*N.J.S.A.* 2A:34-23 (emphasis supplied).]

Under the enabling statute, then, the trial court must consider three separate factors when determining the award, if any, of counsel fees: "the factors set forth in the court rule on counsel fees, the financial circumstances of the parties, and the good or bad faith of either party." *Ibid.* Those shall be examined separately.

*Rule* 4:42–9(b) and (c) specifically, clearly, and unequivocally set forth the proof requirements on any application for counsel fees. There is nothing permissive about the dictates of *Rule* 4:42–9; its command is mandatory and compliance with its terms is not optional. When, as here, the matter in issue is a "family action,"

*Rule* 5:1–2(a) imposes additional requirements on an application for counsel fees.

On the record before us, it appears, at first blush, that defendant eschewed compliance with both *Rule* 4:42–9 and *Rule* 5:3–5(c). However, because we are unable to ascertain the reason for that failure of proof, a limited remand is appropriate. Nevertheless, this remand should not be an invitation for a *nunc pro tunc* submission of an affidavit of services; if an affidavit of services should have been filed and was not, it should not be considered now and nothing in the majority's opinion should be read so as to authorize any untimely affidavit of services.

In sum, while I agree that the concept of marital fault is irrelevant to an award of counsel fees, my concurrence stems from my view of what the Divorce Act of 1971 and our Rules of Court specifically enumerate as relevant to a counsel fee award, and not on any notion of forgiving a party's unexplained failure to bear its clearly established burden of proof. Those principles, and those principles alone, should govern the remand on counsel fees.

### III.

This brings me to the core issue on appeal: can marital fault be considered by the trial court in an alimony award and, if so, to what extent. As noted earlier, the majority concludes that trial courts are barred from considering marital fault save for "two narrow instances: cases in which the fault has affected the parties' economic life and cases in which the fault so violates societal norms that continuing the economic bonds between the parties would confound notions of simple justice." *Ante,* 183 *N.J.* at 72, 869 *A.*2d at 905. I respectfully disagree.

### A.

As the majority properly points out, the interrelationship between marital fault and alimony is well engrained in our system. From its adoption, the Divorce Act of 1971 specifically provided

that, "[i]n all actions for divorce other than those where judgment is granted solely on the ground of separation the court may consider also the proofs made in establishing such ground in determining an amount of alimony or maintenance that is fit, reasonable and just." *N.J.S.A.* 2A:34-23g. The Divorce Act of 1971 enumerates the grounds for divorce; having begun with the 1907 grounds for divorce of adultery and desertion, *L.* 1907, *c.* 216, § 2, *p.* 474, to which extreme cruelty was added in 1923, *L.* 1923, *c.* 187, § 1, *p.* 494, they now also include separation, voluntarily induced drug or alcohol addiction, institutionalization for mental illness for more than twenty-four consecutive months, incarceration for eighteen or more consecutive months, and non-consensual voluntary deviant sexual conduct. *L.* 1971, *c.* 217, § 11, *p.* 1075 (codified at *N.J.S.A.* 2A:34-2). Eliminating separation from the list, then, means that, under the plain language of the Divorce Act of 1971, "the court may consider also the proofs made in establishing [adultery, desertion, extreme cruelty, voluntarily induced drug or alcohol addiction, institutionalization for mental illness for more than twenty-four consecutive months, incarceration for eighteen or more consecutive months, and non-consensual voluntary deviant sexual conduct] in determining an amount of alimony or maintenance that is fit, reasonable and just." *N.J.S.A.* 2A:34-23.

B.

This commonsense reading of the Divorce Act of 1971 is buttressed by its legislative history. During the late 1960's, New Jersey considered whether to update its then-dated divorce laws, some of which harkened back to 1907 and had most recently been amended in 1948. As a result, in 1967, New Jersey legislatively created the New Jersey Divorce Law Study Commission. *L.* 1967, *c.* 57, as amended *L.* 1968, *c.* 170 and *L.* 1969, *c.* 25. The statutory duty of the Divorce Law Study Commission was

> to study and review the statutes and court decisions concerning divorce and nullity of marriage and related matters, particularly as contained in Title 2A of the New Jersey Statutes as amended and supplemented and other legislative enactments,

relating to the said subject matter and to study the advisability and practicality of creating a family law court.
[*L.* 1967, *c.* 57, § 4].

See also *Public Hearing before the New Jersey Divorce Law Study Commission,* at 1 (Jan. 30, 1969) (*1969 Hearing*) (The purpose of the Divorce Study Commission is to engage in "the study and review of the statutes and court decisions concerning divorce, annulity [sic] of marriage and related matters."). The charge of the Divorce Law Study Commission was clear:

The commission may meet and hold hearings at such place or places as it shall designate during the sessions or recesses of the Legislature and shall report its findings to the governor and the Legislature accompanying the same with any legislative bills which it may desire to recommend for adoption by the Legislature on or before January 13, 1970, or as soon thereafter as may be possible.

[*L.* 1969, *c.* 25, § 1 (amending *L.* 1967, *c.* 57, § 8 and *L.* 1968, *c.* 170, § 1).]

Whether marital fault should be retained as an element of alimony was a matter of debate before the Divorce Law Study Commission, with strong opposition advanced against retaining marital fault as part of the alimony formula. *See 1969 Hearing,* at 71 ("[T]he alimony concept should be retained, but it should not be awarded on the basis of fault."); *id.* at 26A ("I would try to eradicate the fault element because this is what perverts and distorts alimony in many states.").

In its final report, the Divorce Law Study Commission struck a compromise. It started from the premise that "fault, where so asserted as a ground for relief [for divorce], will be a proper consideration for the judiciary in dealing with alimony and support," New Jersey Divorce Law Study Commission, *Final Report to the Governor and the Legislature,* at 7 (May 11, 1970) (*Final Report*), and concluded with the aspirational thought that "perhaps the penalty should fit the 'crime,' i.e., the flagrant offender, whether plaintiff or defendant (husband or wife), may be subject to equitable principles when alimony, custody and property rights are determined." *Id.* at 8. That conclusion, however, was couched in terms of what the Commission thought the Legislature—and not the judiciary—should consider in connection with future changes to the Divorce Law. *Ibid.*

The compromise reached by the Divorce Law Study Commission was straightforward and fairly grounded on the Divorce Law Study Commission's recommendation that a new "no fault" ground for divorce—separation—be adopted as part of New Jersey's legal landscape. ("This revision proposes that 2A:34–23 be amended to permit the fault of the parties to be considered in awarding alimony but that such element should be excluded when the divorce is based upon the new separation ground." *Id.* at 64–65.) The *Final Report's* conclusions on this matter are worthy of review at length:

> The last sentence of the proposed amendment permits the court to deny alimony to a spouse who is guilty of one of the fault grounds for divorce. As long as fault grounds are retained, it is traditional logic that fault also should affect judicial discretion in awarding alimony. *After further study a new Commission may conclude that fault has no place in either the provision of grounds for divorce or in determining alimony but for the time being the substance of existing law is retained.*
>
> Where both parties make out a ground for divorce the court *may* deny alimony to either party. There is no automatic bar, as in New York, nor disregard of matrimonial fault, as under the new California law. Thus, the adulterous, deserting, or extremely cruel wife may be deprived of alimony at the court's discretion. Fault is irrelevant, however, where the non-fault ground of separation is the ground for divorce, and in such cases the economic factor and the duration of the marriage will be the determinants as to alimony.
>
> *The objective of the proposed amendment is to adapt section 2A:34–23 to the new and revised grounds for divorce with the least possible amount of disruption pending a full scale study by a new Commission of the present law of alimony and matrimonial property.* The major change in policy is the granting of discretion to award alimony where both parties make out a cause for divorce. In other words, giving cause for divorce would not be an automatic bar to alimony where there was actual need and ability to pay, but the court may consider it in the exercise of its judicial discretion. In the case of the non-fault separation ground, it appears to be logically consistent to make fault irrelevant both as to the ground and the possible grant of alimony.
>
> [*Id.* at 94–95 (emphasis in the original and supplied).]

The Divorce Law Study Commission thus expressed a well-founded confidence in our trial courts, and therefore commended marital fault as a factor to be considered by the trial court in the exercise of its discretion in determining alimony. The Divorce Law Study Commission emphasized that any future consideration of whether fault plays a part in an alimony award was reserved to

the Legislature, either directly or by again creating a Commission to examine the question.

When the Legislature considered the work and recommendations of the Divorce Law Study Commission, it also heard from individual members of the Divorce Law Study Commission. Among the matters on which the Legislature focused was the retention of fault as a factor in alimony awards. In response to a question from the Chairman of the Assembly Judiciary Committee, the then-Chairman of the Divorce Law Study Commission made clear that:

> [t]he three factors that will be considered [in determining alimony] in all cases are: actual need of both parties, ability to pay or resources of both parties, and the duration of the marriage. Where fault is introduced under one of the traditional grounds, whether affirmatively or by way of defense, that will be the fourth factor to be considered by the court. That was a policy judgment by the Commission, espoused very vigorously by Senator Beadleston that the Commission ultimately adopt it, that under certain circumstances fault should appropriately be considered. [Statement of Assemblyman Richard W. DeKorte, Chairman of the Divorce Law Study Commission, *Public Hearing before the New Jersey Legislature, Assembly Judiciary Committee, on Assembly Bill No. 1100*, at 30A–31A (Oct. 30, 1970).]

Based on the recommendations of the Divorce Law Study Commission, the Legislature adopted *N.J.S.A.* 2A:34–23g which, as noted earlier, now as then provides that "[i]n all actions for divorce other than those where judgment is granted solely on the ground of separation [that is to say, either adultery, desertion, extreme cruelty, voluntarily induced drug or alcohol addiction, institutionalization for mental illness for more than twenty-four consecutive months, incarceration for eighteen or more consecutive months, and non-consensual voluntary deviant sexual conduct] the court may consider also the proofs made in establishing such ground in determining an amount of alimony or maintenance that is fit, reasonable and just." *N.J.S.A.* 2A:34–23g. It is most telling that, when it enacted *N.J.S.A.* 2A:34–23g, the Legislature adopted—word for word—the language submitted by the Divorce Law Study Commission. *Compare N.J.S.A.* 2A:34–23g *with Final Report*, at 93, 112. Since then, and although the Legislature has revisited the alimony and support provisions of the Divorce Act of 1971 five different times since its enactment—in 1980, 1983, 1988,

1997 and 1999—the Legislature chose not to amend the language now codified at *N.J.S.A.* 2A:34-23g.

It is on this rather plain expression of legislative intent that today we engraft a new—and, in my view, wholly unwarranted—limitation, requiring that *N.J.S.A.* 2A:34-23g now be read as follows:

> In all actions for divorce where judgment is granted on the fault ground of adultery, desertion, extreme cruelty, voluntarily induced drug or alcohol addiction, institutionalization for mental illness for more than 24 consecutive months, incarceration for 18 or more consecutive months, and non-consensual voluntary deviant sexual conduct, but not separation, the court may consider also the proofs made in establishing such ground in determining an amount of alimony or maintenance that is fit, reasonable and just, *but only to the extent that such fault ground either (1) affected the parties' economic life or (2) so violates societal norms that continuing the economic bonds between the parties would confound notions of simple justice.*
>
> [added language emphasized.]

As the preceding analysis demonstrates, this new limitation is unfounded in either the enabling statute or in its legislative history. It is similarly unfounded in the over thirty years of jurisprudence emanating from the Divorce Act of 1971.

### C.

June 5, 1974 marked the first day we reviewed the Divorce Act of 1971; we did so in a quartet of cases handed down the same day and we addressed the scope of fault in determining alimony in three of these four cases.[3] In the first of these, *Scalingi v. Scalingi*, 65 *N.J.* 180, 320 *A.*2d 475 (1974) (per curiam), we sustained an alimony award against a claim that it was excessive in light of the equitable distribution made. Rejecting that argument, we stated:

---

[3] The fourth case in this quartet, *Rothman v. Rothman*, 65 *N.J.* 219, 320 *A.*2d 496 (1974), does not consider the issue of fault as a factor in determining alimony, as it deals almost exclusively with equitable distribution. However, it does contain a discussion of the relationship between equitable distribution and alimony that, while not directly on point, assists in informing the discussion here. *Id.* at 228-30, 320 *A.*2d 496.

We are dealing with the breakup of a 35–year marriage with defendant found to be the marital wrongdoer. Plaintiff, now 60 years of age, no longer has the comforts of the marital home which had been provided by defendant. Considering these factors as well as the respective incomes of the parties, it has not been shown that the order for support, as presently applied, is arbitrary or unreasonable.

[*Id.* at 184, 320 *A*.2d 475 (citation omitted).]

Clearly, then, at our very first opportunity to do so, we endorsed the application of marital fault to an award of alimony under the Divorce Act of 1971.

We next decided *Chalmers v. Chalmers*, 65 *N.J.* 186, 193–94, 320 *A*.2d 478 (1974), where we distinguished between alimony and equitable distribution under the Divorce Act of 1971, noting that "[o]ur amended statute ... mentions the grounds for a divorce (other than separation) as a consideration in determining an amount of alimony or maintenance[.]" In *Chalmers,* we also noted that the *Final Report* states that "fault where so stated as a ground for relief, will be a proper consideration for the judiciary in dealing with alimony and support." *Id.* at 194 n. 4, 320 *A*.2d 478.

In the last relevant case of the original quartet, *Painter v. Painter*, 65 *N.J.* 196, 205, 320 *A*.2d 484 (1974) (citing *N.J.S.A.* 2A:34–23), we made clear that

[a]limony may be awarded to either spouse. Except where the judgment for divorce is granted on the no-fault ground of separation, the court may, in awarding alimony, consider the proofs submitted in support of the ground upon which the judgment of divorce is made to rest.

This brings us quickly to *Kinsella v. Kinsella,* 150 *N.J.* 276, 696 *A*.2d 556 (1997). As even the majority acknowledges, *Kinsella* is not an alimony case, but one dealing with

whether the psychologist-patient privilege may be invoked by a patient to prevent discovery of psychotherapeutic treatment records in the context of three aspects of matrimonial litigation: a marital tort claim against the patient, an extreme cruelty claim for divorce by the patient, and a child custody dispute between the patient and his spouse.

[*Id.* at 285, 696 *A*.2d 556.]

In that context, and only in the way of dicta, *Kinsella* states that "the focus of the decision regarding alimony is generally on the financial circumstances of the parties[,]" and that "[o]ur perception

is that, in today's practice, marital fault rarely enters into the calculus of an alimony award." *Id.* at 314–15, 696 *A.2d* 556.

The majority relies on *Kinsella* as the starting point for its analysis. However, any reliance on *Kinsella* as the basis for today's limitation on the role of fault in an alimony award is misplaced for at least two separate reasons. First, *Kinsella* itself introduces its discussion on alimony with the overriding principle that, "[a]ccording to the statute, except where the judgment is granted solely on the ground of separation, proofs made in establishing the grounds for divorce may be considered 'in determining an amount of alimony or maintenance that is fit, reasonable and just.'" *Id.* at 314, 696 *A.2d* 556. Thus, anything else *Kinsella* describes concerning alimony must be viewed through that prism.

Second, and perhaps more importantly, *Kinsella* admits—much as the majority also perforce admits—that its sense that "marital fault rarely enters into the calculus of an alimony award" is entirely anecdotal, thus underscoring the need foreseen by the Divorce Law Study Commission over thirty years ago: that any future consideration of whether fault plays a part in an alimony award is properly reserved to the Legislature, either directly or by again creating a commission to study the matter, conduct public hearings and make recommendations to the Legislature. *Final Report*, at 95 ("The objective of the proposed amendment is to adapt section 2A:34–23 to the new and revised grounds for divorce with the least possible amount of disruption *pending a full scale study by a new Commission of the present law of alimony and matrimonial property*."). At oral argument, even defendant's counsel readily conceded that this is a matter that must be addressed by the Legislature. With the party advancing the proposition here having made that concession, the proper path is clear: relief, if any, lies in the legislative, and not in the judicial, branch.

Common sense compels agreement with *Kinsella's* general observation that, "[i]n most cases, the practical consequences of succeeding in a divorce action on fault-based grounds, as opposed

to separation, are minimal." *Kinsella v. Kinsella, supra,* 150 *N.J.* at 313, 696 *A.*2d 556. However, one cannot pick and choose among *Kinsella's* dicta, because, as *Kinsella* readily admits, the Divorce Act of 1971 retains a practical and meaningful difference between fault and no-fault divorces: the relevance of fault to alimony. *Id.* at 314, 696 *A.*2d 556. More to the point, as an appellate court that consistently insists that its rulings must be firmly grounded in the record, our reliance on what is admittedly anecdotal is unjustified.

Since 1977, no published decision of this Court has seen the need to address squarely the effect of *N.J.S.A.* 2A:34–23g on the calculation of alimony.[4] That absence of case law suggests strongly that everyone readily understands what the Legislature intended when it gave trial courts the discretion, but not the obligation, to consider fault proven as part of an alimony determination. In that regard, the underpinnings of the majority's analysis—a lack of clarity as to "the Legislature's intent in respect of how a court is to calculate the impact of fault on an alimony award," *ante,* 183 *N.J.* at 84, 869 *A.*2d at 913 that requires a "search for a principled approach to the relationship between fault and alimony consistent with legislative intent," *ante,* 183 *N.J.* at 89, 869 *A.*2d at 915 is far too slender a reed upon which to rest the jettisoning of now well-settled law.

The statutory standard embodied in *N.J.S.A.* 2A:34–23g, the exercise of judicial discretion, is clear and requires no additional explanation. Our trial courts have applied this standard in a manner consistent with basic principles of justice and equity, and there is no wrong here that requires a remedy. Plaintiff's counsel, at oral argument, said it best: "If it's not broken, don't fix it."

### D.

My objection to our new rule of law restricting the role of fault in the calculus of an alimony award is not assuaged even if I were

---

[4] To the extent any Appellate Division decision can be read to the contrary, I would specifically disapprove it.

to assume either that the majority's legal analysis is correct, or that the majority's conclusion is consonant with the statute and its legislative and decisional history, or that this branch of government is the proper forum for this decision. As structured, the construct tendered by the majority is unworkable.

The paradigm we adopt today undoubtedly will generate its own flood of litigation because it defies definition. As a result, it takes little imagination to foresee the unending number of claims the standard adopted today—that a party's fault "affected the parties' economic life"—will bring. Determining just what "affected the parties' economic life" means and, when proven, to what degree the parties' economic life must be affected before that fault can be considered as part of an alimony calculus will add a highly combustible additive to the already overly-charged atmosphere of matrimonial litigation. The imprecision and resulting confusion of this new standard is brought into sharp focus when it is gauged against the standard it seeks to supplant, and a standard in which our trial courts are well versed: the exercise of discretion.

Similarly, determining what constitutes "fault [that] so violates societal norms that continuing the economic bonds between the parties would confound notions of simple justice" is too subjective a standard, converting the analysis into a simple question of whose personal value system will prevail. It is not a stretch to conclude that having your spouse engage in sexual relations with your friend and yet still demand that you support his lifestyle after divorce at the rate of over $150,000 per year "confound[s] notions of simple justice." If that is not what this standard means, then it is meaningless. If, on the other hand, that is precisely what this new standard means, then we have created a new and unproven process to achieve a result already reached by tried-and-true methods.

IV.

After thirty uninterrupted years of consistent jurisprudence, we are called on to discern the Legislature's intent when it stated, in

rather plain words, that "the court may consider also the proofs made in establishing such ground in determining an amount of alimony or maintenance that is fit, reasonable and just" in determining alimony in all fault-based actions for divorce. *N.J.S.A.* 2A:34–23g. The Legislature could not have been clearer. To claim that "the statutory provision permitting consideration of 'the proofs made' in a fault-based divorce does not specify how judges are to weigh proof of fault in establishing alimony," *ante,* 183 *N.J.* at 89, 869 *A.*2d at 915 misses the point persuasively made by the Legislature: the effect of fault on the *calculus* of alimony is entrusted to the sound discretion of the trial court. The Legislature commanded that, in the exercise of discretion, the trial court should consider *all* fault grounds proved, and not just the limited categories we ratify today. Whether, in the exercise of that discretion, trial courts give greater or lesser weight to one aspect of fault over another is precisely what the exercise of discretion is all about. Given the clear statutory intent, it is improper to judicially codify legislatively-rejected limits on that exercise of discretion.

In the final analysis, I would not jettison that which has served us well for over thirty years. If there is a groundswell of opposition to the terms of the Divorce Act of 1971 or the manner in which it has been applied, it has certainly escaped everyone's attention—including that of the practitioners who toil in the area daily. By the same token, in light of both the clear message of the drafters of the Divorce Act of 1971, the clear language of the Divorce Act itself, and over thirty years of consistent judicial interpretation by this Court, the Divorce Act should be read to mean precisely what it says. Defendant's complaint should not be addressed to this Court, but to the forum where it properly belongs: the Legislature. We should analyze this case under the traditional abuse of discretion standard and determine that, under the circumstances, the trial court did not abuse its discretion. Anything more exceeds our proper role.

For the foregoing reasons, I respectfully dissent.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—6.

*For concurrence in part; dissenting in part*—Justice RIVERA-SOTO—1.